# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 22 2016, 8:42 am

Kevin S. Smith

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Jill M. Acklin
McGrath, LLC
Carmel, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of: K.C. (*Minor Child*)<br><br>and<br><br>R.M. (*Father*),<br><br>*Appellant-Respondent,*<br><br>v.<br><br>The Indiana Department of Child Services,<br><br>*Appellee-Petitioner* | February 22, 2016<br><br>Court of Appeals Case No.<br>49A04-1505-JT-378<br><br>Appeal from the Marion County Superior Court<br><br>The Honorable Marilyn Moores, Judge<br><br>The Honorable Larry Bradley, Magistrate<br><br>Trial Court Cause No.<br>49D09-1410-JT-439 |

**Robb, Judge.**

# Case Summary and Issue

[1]     R.M. ("Father") appeals the juvenile court's order terminating his parental rights to K.C., his son.  Father raises the sole issue of whether the juvenile court erred by using Father's failure to comply with the Interstate Compact for the Placement of Children ("ICPC") as a basis for terminating Father's parental rights.  Father contends the ICPC does not apply to the placement of a child with an out-of-state biological parent.  Regardless of the applicability of the ICPC, we conclude the Indiana Department of Child Services ("DCS") established by clear and convincing evidence the requisite elements to support termination of Father's parental rights.  We therefore affirm the juvenile court's order terminating Father's parental rights to K.C.

# Facts and Procedural History

[2]     T.D. ("Mother") and Father are the biological parents of K.C. (born January 16, 2006).[1]  On December 18, 2012, DCS petitioned for T.D.'s four children, including K.C., to be adjudicated children in need of services ("CHINS").[2]  The petition alleged in relevant part,

> [Mother] has failed to provide the children with a safe and appropriate living environment free from domestic violence.

---

[1] In the order terminating Father's parental rights, the juvenile court found "[R.M.] is the father of [K.C.]" Appellant's Appendix at 23.  We note this finding because R.M. is referred to as the alleged father of K.C. in many of the other documents included in the record.

[2] R.M. is not the father of T.D.'s other three children.

[Mother] arrived at the hospital and threatened the lives of her children. [Mother] further disclosed years of domestic violence that the children witnessed on multiple occasions. The children also reported observing their mother attempting to commit suicide several times. Additionally, [Mother] lacks stable housing, the children have stated they do not have a home, and they have lived in numerous shelters throughout their lives. [Mother] also has severe mental health issues that require medical attention, and [Mother] is currently being investigated by another state for neglect.

Exhibit Volume at 3. As to Father, the petition alleged his whereabouts were unknown and that Father failed to demonstrate the ability or the willingness to appropriately parent K.C. Mother admitted her children were CHINS on January 2, 2013. DCS was still searching for Father at this time.

[3] DCS eventually located Father in Ohio. On April 10, 2013, Father appeared and admitted K.C. was a CHINS. On May 15, 2013, the juvenile court conducted a dispositional hearing and entered a parental participation order requiring Father to complete the Fatherhood Engagement Program and cooperate with the ICPC process. The juvenile court also authorized Father to have increased parenting time, including a trial home visit, "pending positive recommendations from service providers." *Id.* at 46. Father stated he did not believe the ICPC was necessary, but the juvenile court advised Father that failure to participate in services could lead to the termination of his parental rights. DCS stated it already submitted the paperwork for the ICPC in Ohio and had yet to receive a home study report on Father.

[4]     Father failed to cooperate with DCS's first referral for ICPC assessment in 2013. DCS made a second referral for ICPC assessment in February 2014. Father cooperated with the second referral, but the Ohio Office of Families and Children ("OFC") did not approve an ICPC placement, at least in part because Father's home did not have electricity and a member of Father's household refused to be fingerprinted.[3] In August 2014, DCS attempted a third referral for ICPC assessment after Father reported his home environment had improved, but OFC declined to conduct a third assessment. OFC referred DCS to the documentation provided after the second assessment, which included reasons "other than the home environment" for rejecting placement. Transcript at 193. DCS did not attempt a fourth referral.

[5]     Father was also unsuccessfully discharged from the Fatherhood Engagement Program. On September 24, 2014, the juvenile court conducted a permanency hearing and found Father had not seen K.C. in a year and that Father had not demonstrated the ability or willingness to properly parent K.C. Accordingly, DCS recommended K.C.'s permanency plan be changed from reunification to adoption. The juvenile court approved the change, concluding the current plan did not meet the special needs and best interests of K.C.

---

[3] Father testified he received letters stating specific reasons for the ICPC denial, but these letters were not admitted into evidence.

[6] On October 20, 2014, DCS filed a petition for the involuntary termination of Father's parental rights to K.C.[4] Following a fact-finding hearing in April 2015, the juvenile court took the petition under advisement. Then, on May 6, 2015, the juvenile court entered an order terminating Father's parental rights. This appeal followed.

# Discussion and Decision

## I. Standard of Review

[7] The Fourteenth Amendment to the United States Constitution protects the right of parents to establish a home and raise their children. *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009). "We recognize, however, that parental interests are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Id.* When a parent is unable or unwilling to meet his parental responsibilities, his parental rights may be terminated. *Id.* at 1259-60.

[8] Decisions to terminate parental rights are among the most difficult and fact-sensitive our juvenile courts are called upon to make. *In re E.M.*, 4 N.E.3d 636, 640 (Ind. 2014). We review such decisions with great deference, recognizing the juvenile court's superior vantage point for evaluating the evidence. *Id.* We therefore consider only the evidence that supports the judgment and the

---

[4] Mother voluntarily terminated her parental rights by consenting to the adoption of K.C.

reasonable inferences to be drawn from that evidence. *Id.* at 642. We do not reweigh the evidence or reassess witness credibility. *Id.*

[9] Here, the juvenile court entered findings of fact and conclusions thereon in the order terminating Father's parental rights. When reviewing findings and conclusions in a case involving the termination of parental rights, we apply a two-tiered standard of review. *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010). First, we determine whether the evidence supports the findings. *Id.* Then, we determine whether the findings support the judgment. *Id.* We will set aside the juvenile court's judgment only if it is clearly erroneous; that is, "if the findings do not support the [juvenile] court's conclusions or the conclusions do not support the judgment." *Id.* (citation omitted).

[10] Indiana Code section 31-35-2-4(b)(2) provides the requirements for involuntary termination of the parent-child relationship:

> The petition must allege:
>
> (A) that one (1) of the following is true:
> > (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
> * * *
> (B) that one (1) of the following is true:
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

* * *

> (C) that termination is in the best interests of the child; and
> (D) that there is a satisfactory plan for the care and treatment of the child.

The State must present clear and convincing evidence of each element. *In re G.Y.*, 904 N.E.2d at 1261. The evidence need not show that continued custody by the parent would be wholly inadequate for the child's survival. *Id.* It is sufficient for the State to show by clear and convincing evidence that the child's emotional and physical development are threatened by the parent's custody. *Id.*

## II. Interstate Compact for the Placement of Children

The ICPC, enacted in all fifty states, "provides a mechanism by which children can be sent to new foster or adoptive homes across state lines." *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 145 n.2 (Ind. 2005). The ICPC "includes a reporting requirement that allows a receiving state to investigate the fitness of the proposed home and to determine whether the child may be placed according to a proposed plan." *Id.*; *see also* Ind. Code § 31-28-4-1. Its conditions for placement "are designed to provide complete and accurate information regarding children and potential adoptive parents from a sending state to a receiving state and to involve public authorities in the process in order to ensure children have the opportunity to be placed in a suitable environment." *In re Adoption of Infants H.*, 904 N.E.2d 203, 208 (Ind. 2009).

In the present case, the juvenile court ordered Father to comply with the ICPC process and notes in its findings that Father failed to cooperate on DCS's first

referral and was denied on its second and third referrals. Father argues the juvenile court erred by using Father's failure to comply with the ICPC as a basis for terminating his parental rights because the ICPC does not apply to the placement of a child with a biological parent. Indeed, another panel of this court, in a divided opinion, recently decided the ICPC does not apply when the contemplated placement is with a biological parent. *In re D.B.*, 43 N.E.3d 599, 603-04 (Ind. Ct. App. 2015), *trans. denied*. Regardless of the applicability of the ICPC, however, we conclude DCS established by clear and convincing evidence the requisite elements to support termination of Father's parental rights.

## III. Termination of Father's Parental Rights

[13] Father's sole argument on appeal is that the juvenile court erred by using Father's failure to comply with the ICPC as a basis for terminating his parental rights. Father does not otherwise challenge the juvenile court's findings and conclusions, which included in relevant part:

> 3. A [CHINS petition] was filed on [K.C.] on December 18, 2012, . . . on allegations of instability, untreated mental health concerns, and domestic violence. Allegations against [Father] included his whereabouts w[ere] unknown, as was his ability or willingness to parent.
> * * *
> 6. [K.C.] was found to be in need of services as to [Mother] on January 2, 2013.
> * * *
> 8. On April 10, 2013, [Father] waived formal fact-finding and [K.C.]'s adjudication as a CHINS was confirmed.

9. Disposition for [Father] was held on May 15, 2013.

10. [Father] resides in Ohio and was ordered to complete an [ICPC]. Two ICPC referrals were made. [Father] failed to comply on the first referral and was denied on the second referral.

11. [DCS] attempted to refer an ICPC a third time after [Father] explained his home environment had changed. The ICPC was not done due to reasons other than [Father]'s home.

12. [DCS] referred The Fatherhood Engagement Program in order to better ascertain [Father]'s ability to parent and to identify areas of need. [Father] failed to complete the program.

13. At the time of the second ICPC referral, [Father] was without electricity in his home, was without a job or car, and had a criminal record which included drug offenses.

14. [Father] has had limited contact with [K.C.], having visits in March of 2013 and September of 2014. Visits were offered at times but [Father] did not follow through.

15. Limited contact is also demonstrated by [Father] not knowing his child was involved in a CHINS case until the case had been open approximately three months . . . .

16. [K.C.] has behavioral problems which include being physically and verbally abusive, lying, and some instances of inappropriate sexual behavior. He does receive therapy and is making some progress.

17. [K.C.]'s diagnosis includes Oppositional Defiance Disorder, Attention Deficit, Hyperactivity Disorder, and Post Traumatic Stress Disorder.

18. [Father] agrees with [K.C.] receiving treatment. [Father] does not know if he has insurance to continue treatment if [K.C.] were to be placed with him.

19. [K.C.] is placed in a pre-adoptive home with his two siblings. His caregivers provide the stable and consistent environment that [his] special needs call for.

20. [K.C.] needs permanency as soon as possible. The lack of permanency, after being in limbo for two years, may delay progress with his behavior.

21. There is a reasonable probability that the conditions that resulted in [K.C.]'s removal and continued placement outside the home will not be remedied by [Father]. [Father] has had ample time to participate in services and demonstrate he is now stable and has t[he] ability and means to parent [K.C.] and meet his special needs. Although he voices that he wants to parent, his effort falls short. He has not taken reasonable action to be in his child's life through visits and other means to show this court he is really willing to parent [K.C.] though having two years to do so. * * *

24. Continuation of the parent-child relationship poses a threat to [K.C.]'s well-being in that it would pose as a barrier to obtaining much needed permanency for him through an adoption with his siblings and into a family where it is known that he will have his emotional and special needs met.

25. Termination of the parent-child relationship is in the best interests of [K.C.] Termination would allow him to be adopted into the kind of permanent, stable and consistent environment which he needs in order to progress.

26. There exists a satisfactory plan for the future care and treatment of [K.C.], that being adoption.

App. at 23-25.

[14] Father contends the ICPC denial was a prominent factor in the termination proceedings, but it is apparent from the juvenile court's findings that many other factors weighed heavily. Father has a criminal record, including two felony convictions for assault and drug trafficking.[5] Father admits he "did a lot of drugs before," but he claims he has not used drugs in two or three years. Tr. at 12. In February 2014, Father was unemployed, did not have electricity in his house, and was without a car. *See McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003) (stating a court may properly consider evidence of a parent's prior criminal history, drug abuse, unemployment, and lack of adequate housing in judging a parent's fitness). As for K.C.'s behavioral issues, Father does not know if he has the means to continue K.C.'s therapy.

[15] Father's contact with K.C. has been limited at best. At the time the CHINS petition was filed, Father's whereabouts were unknown, and he was unaware of the CHINS proceedings for approximately three months. From December 2012 to April 2015, Father visited K.C. only twice, and he declined opportunities for additional visits. Father also failed to participate in the services ordered by the juvenile court. The juvenile court referred Father to the Fatherhood Engagement Program, but Father was unsuccessfully discharged

---

[5] Father was convicted of assault for shooting another person "out of pride." Tr. at 19-20.

from the program. In short, Father failed to take any meaningful action to be in K.C.'s life or show that he is really willing to parent K.C. Father's failure to exercise his right to visit K.C. demonstrates a lack of commitment to completing the actions necessary to preserve the parent-child relationship, and his pattern of unwillingness to cooperate with DCS supports a finding that there is no reasonable probability that the reasons for placement outside Father's home will change. *See Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*.

[16] The juvenile court emphasized K.C.'s need for permanence because K.C. has been "in limbo" since the filing of the CHINS petition. App. at 24. Prior to December 2012, K.C. resided with Mother. From December 2012 to September 2013, he was in foster care. He was briefly placed in relative care in September 2013, only to be returned to foster care in October 2013. He remained in foster care until April 2014 when he was placed in Mother's care for a trial home visit. The trial home visit ended in June 2014 when DCS removed K.C. from Mother's care following another domestic violence incident. Although the juvenile court also authorized Father to have a trial home visit with K.C., that opportunity was conditioned upon positive recommendations from his service providers. Father squandered this opportunity by failing to complete the Fatherhood Engagement Program.

[17] K.C. was removed from Mother's care because Mother failed to provide a safe and appropriate living environment. In the two years following the filing of the CHINS petition, Father was given ample time to demonstrate his ability to

provide a safe, stable living environment. Although Father says he wants to parent K.C., Father failed to maintain contact with K.C., failed to participate in services, and failed to show he is capable of meeting K.C.'s needs. In light of Father's complete lack of effort, criminal history, and recent financial instability, we cannot say the juvenile court clearly erred in concluding there is a reasonable probability that the reasons for placement outside Father's home will not be remedied and that termination is in K.C.'s best interests. *See* Ind. Code § 31-35-2-4(b)(2)(B), (C). Given K.C.'s current placement in a safe, stable pre-adoptive home with his siblings, we furthermore agree adoption is a satisfactory plan for the care of K.C. *See* Ind. Code § 31-35-2-4(b)(2)(D). DCS established by clear and convincing evidence the requisite elements to support termination of Father's parental rights.

# Conclusion

[18] Concluding the juvenile court's decision terminating Father's parental rights was not clearly erroneous, we affirm.

[19] Affirmed.

Barnes, J., and Altice, J., concur.