

**FILED**

Feb 12 2015, 7:13 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Danielle L. Gregory
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of:

S.A. (Minor Child), Child in
Need of Services,

And

M.H. (Father),

*Appellant-Respondent,*

v.

The Indiana Department of
Child Services,

*Appellee-Petitioner*

February 12, 2015

Court of Appeals Case No.
49A02-1402-JC-74

Appeal from the Marion Superior
Court
The Honorable Marilyn Moores,
Judge
The Honorable Diana Burleson,
Magistrate
Case No. 49D09-1306-JC-16347

**Crone, Judge.**

[1] The Indiana Department of Child Services ("DCS") has filed a petition for

rehearing of our opinion in *Matter of S.A.*, 15 N.E.3d 602 (Ind. Ct. App. 2014).

We grant the petition for the limited purpose of dispelling DCS's misconceptions about our opinion and reaffirm our original decision in all respects.

[2] The facts essential for rehearing are as follows. S.A. ("Child") was born in August 2011 to A.A. ("Mother"). Child's biological father, M.H. ("Father"), was present for Child's birth but spent the next two years on active duty in the U.S. Navy. Father did not pay support or furnish any items for Child's care.

[3] In June 2013, DCS received a report alleging that Mother was neglecting Child as a result of using heroin and that Child's maternal grandmother ("Grandmother") had taken him into her home. DCS interviewed Grandmother, who stated that she was seeking temporary guardianship of Child. DCS interviewed Mother, who admitted using heroin but denied allegations that she did so in Child's presence and that her relationship with her boyfriend was violent. DCS had no information about Father other than his name and attempted to contact him via Facebook.

[4] The trial court authorized DCS to file a petition alleging Child to be a child in need of services ("CHINS"). The petition alleged that Mother was using drugs and lacked stable housing and that Father's whereabouts were unknown. After an initial hearing, the court ordered Child to be placed with Grandmother. Father did not attend the hearing, and Mother said that she had not seen him for over a year and did not know where he was. Father became aware of the proceedings and filed a motion for paternity testing in July 2013. Father stated

that he was stationed in Texas and requested permission to appear at future proceedings telephonically. Father did so at the third initial hearing in August 2013 and requested the assistance of counsel. The trial court entered a denial of the allegations raised in the CHINS petition on Father's behalf and appointed a public defender to represent him. The court also granted Father's motion to establish paternity.

In September 2013, pursuant to an agreement with DCS, Mother admitted to certain allegations in the CHINS petition, and the trial court adjudicated Child to be a CHINS. The court held a dispositional hearing, ordered Mother to participate in DCS-recommended services, and continued Child's placement with Grandmother. Because the paternity test results were unavailable, the court rescheduled the proceedings as to Father.

Father's paternity was conclusively established in November 2013. Counsel appeared at a hearing on Father's behalf, requested a factfinding hearing, and expressed Father's desire to obtain custody of Child. The trial court set the matter for a factfinding hearing and granted Father supervised parenting time. At the end of November 2013, Father was discharged from the Navy. He moved into his parents' home and began working for United Parcel Service. He also contacted DCS and Child's court-appointed special advocate ("CASA") regarding the CHINS proceedings.

> Every day thereafter, Father spent time with the Child at Grandmother's house. DCS did not observe any of these visits, but Grandmother reported to DCS that, with the exception of some

nervousness and difficulty with diaper changing, Father "interacts well with [the Child]."

The day before the fact-finding hearing, on December 19, 2013, Father attended a Child and Family Team Meeting with DCS and the CASA. There, Father disclosed that he had been diagnosed and treated for post-traumatic stress disorder (PTSD) while on active duty. According to Father, he was hospitalized for four months at University Behavioral Health in Denton, Texas, because he "was having difficulty sleeping, [] couldn't cope with [his] emotions, [and] was dealing with extreme depression." Father explained that after he was released from the hospital in May of 2013, he briefly continued to attend counseling but was no longer receiving treatment.

On December 20, 2013, the trial court held a fact-finding hearing. During the hearing, DCS and the CASA recommended that the trial court continue the Child's CHINS adjudication. Both testified about their concerns regarding the Child's unfamiliarity with Father, as well as Father's lack of prior parenting experience. In addition, based upon Father's revelation that he had been treated for PTSD, DCS and the CASA agreed that Father should undergo a psychological evaluation. At the close of the evidence, the trial court acknowledged that Father's inability "to care for the [C]hild" was due to his out-of-state military service. Nevertheless, the trial court criticized Father for his failure to establish paternity "a lot sooner" and also expressed its concern that Father could not precisely recall when he had been released from his PTSD treatment program. Moreover, the trial court emphasized Mother's near-completion of her services and explained its preference that the Child eventually be released to Mother. Accordingly, the trial court issued written findings in support of its decision to "continue[] the adjudication that [the Child] is a [CHINS]."

On January 10, 2014, the trial court conducted Father's dispositional hearing. Based on DCS' recommendation, the trial court ordered Father to complete a parenting assessment and comply with any subsequent recommended services. The trial court additionally ordered Father to submit documentation regarding his treatment for PTSD or, alternatively, to undergo a psychological evaluation.

*Id*. at 606-07 (citations to transcript and appendix omitted).

Father appealed, challenging the sufficiency of the evidence supporting the trial court's determination that Child remained a CHINS. Before we addressed Father's sufficiency argument, however, we addressed sua sponte "some procedural irregularities and their impact on Father's due process rights." *Id.* at 608. We first stated that

> although Father did, in fact, receive a fact-finding hearing, the trial court had already determined the Child's CHINS status based solely on Mother's admission—notwithstanding the fact that Father was involved in the case and had denied the allegations in the CHINS petition. Because a court cannot issue separate adjudications for each parent, the trial court's CHINS determination should be based on a consideration of the evidence in its entirety. Accordingly, by adjudicating the Child as a CHINS prior to Father's fact-finding hearing, we find that the trial court deprived Father of a *meaningful* opportunity to be heard.

*Id.* at 609. We also stated that

> [b]y failing to issue a dispositional decree that specifically addressed, in part, its bases for placing the Child with Grandmother rather than Father and for ordering participation in services seemingly unrelated to the allegations in DCS' petition, the trial court violated the mandates of Indiana code sections 31-34-19-6 and 31-34-19-10 [which establish standards for dispositional decrees in CHINS proceedings], and "may well have interfered with Father's rights in the upbringing of [the Child]."

*Id.* at 610 (quoting *In re N.E.*, 919 N.E.2d 102, 108 (Ind. 2010)). We concluded that "the trial court's CHINS adjudication was contrary to due process," *id.*, but we resolved the appeal on sufficiency of evidence grounds. *See id.* at 608 n.2

("[W]e will address the due process issue, but we resolve this case on other grounds.").[1]

[8] In addressing Father's sufficiency arguments, we noted that "the trial court identified two primary concerns for finding that the Child is in need of services that he will be unlikely to receive without the court's coercive intervention: (1) Father's disinterest in establishing paternity and supporting his Child and (2) Father's history of PTSD." *Id.* at 610. Regarding the former, we stated,

> By the time of the fact-finding hearing, Father had been discharged from the Navy, had moved back to Indianapolis, and had secured employment. The trial court also found that Father had contacted DCS and the CASA as soon as he returned to Indianapolis and began developing a relationship with the Child. The record further demonstrates that Father filed a motion for paternity testing upon learning of the CHINS petition, and he prepared a bedroom for the Child at his parents' home. In addition, Father stated that he plans to stay with his parents—where the Child is welcome—until he saves enough money to purchase his own home.

> Our supreme court has established that the State's intrusion into parental rights should be limited to instances "where parents lack the *ability* to provide for their children, not merely where they encounter difficulty in meeting a child's needs." *In re S.D.*, 2 N.E.3d [1283, 1287 (Ind. 2014)] (internal quotation marks omitted). DCS does not satisfy its burden of proof by simply highlighting Father's shortcomings as a parent; rather, DCS must establish that Father is unlikely to meet the Child's needs absent coercive court intervention. Neither the trial court's findings nor the other evidence in the record supports such a conclusion. If it were sufficient for the purposes of CHINS

---

[1] DCS contends that our statement regarding the CHINS adjudication "sounds like the law of the case," even though it is clearly dicta. Appellee's Petition for Reh'g at 4. We find this contention meritless.

adjudications that a parent has no prior parenting experience or training, then *all* new parents would necessarily be subject to DCS intervention. Here, Father resolved the allegations raised in the CHINS petition by the time of the fact-finding hearing—he was present in Indianapolis and willing to parent his Child.

*Id*. at 611-12.

[9]     And as for the latter, we said,

> We first note that the issue of Father's PTSD was not raised in the CHINS petition as a basis for DCS involvement. Instead, after Father disclosed his diagnosis, DCS relied upon it as a *post hoc* justification for coercive intervention and now maintains that "[t]he record is clear that the court still had concerns that Father's mental health issues posed a problem to Father's ability to parent [the] Child." At the close of the fact-finding hearing, the trial court stated that it was "not convinced that [Father's] PTSD is under control" because when asked about his release date from the hospital, Father answered "I would guess in May."

> We find Father's voluntary admission of his PTSD history to DCS and the CASA to be indicative of the fact that court intervention would not be necessary to compel Father into treatment. Father testified that he successfully completed the PTSD treatment program in the military ward of a behavioral health hospital, and he continued to see a counselor after his release until it was no longer necessary. Father also testified that part of his treatment regime was learning how to "understand[] when you have warning signs of things going awry." Although it was certainly within the discretion of the trial court to discredit Father's testimony, we find no other basis in the record to support the trial court's conclusion that even if Father requires additional PTSD treatment, he is unlikely to obtain such treatment without coercive intervention. *See In re K.D.*, 962 N.E.2d at 1256 ("Speculation is not enough for a CHINS finding.").

*Id.* at 612 (citations to transcript and appendix omitted). Therefore, we reversed the trial court's order that Child remained a CHINS.

[10] In its petition for rehearing, DCS first contends that

> the record is clear that Mother, at all times relevant to this appeal, had the sole legal custody of Child. Father had just recently established paternity, but there was no custody order in Father's favor. When this Court reversed, the facts indicated that Mother was still working through her substance abuse issues, and was still engaging in services. The court and DCS were considering extending Mother's visitation, but the record does not indicate that Mother was prepared to receive Child back into her care.

> However, when this Court reversed, it effectively sent Child back to a Mother who admitted she needed help with her substance abuse. By reversing, this Court left no room for the CHINS court to protect Child further, and effectively placed the trial court in a position, once this opinion is certified, of immediately returning Child to Mother, who had admitted Child was a CHINS and needed services.

Appellee's Petition for Reh'g at 3.

[11] Father points out that he had filed a petition for modification of custody that was pending at the time of his CHINS hearing and that he asked the court to hear evidence on the petition during the hearing so that Child could be released to him if no basis was found for continuing Child's CHINS status. *See* Tr. at 5 (Father's counsel: "[I]f the Court were to close this case today [Mother and Father] could work out a parenting agreement in terms of um, joint custody, joint physical, and joint um, legal custody for the child. So that, there are no issues with [Father] he is an appropriate parent, which we believe, it will be proven in Court with the fact-finding that the Court would have to close the

case in terms of with [Father], were [sic] we would work out a plan where um, we could have joint custody with [Mother] and [Father] so that the case could close."). The trial court denied Father's request.[2] Because the trial court had an opportunity to modify custody to Father but did not do so, we are unsympathetic to DCS's claims. The parties have not indicated whether a hearing has been held on Father's custody petition or whether a ruling has been issued; we presume that a hearing will be held and a ruling issued in due course if such has not occurred already.

[12] DCS also contends that our opinion "creates confusion and is being interpreted as meaning that a juvenile court must wait until both parents … appear in court at the same time and hears the matter *in its entirety at the same time.*" Appellee's Petition for Reh'g at 5. Our opinion does not say (and should not be interpreted as saying) any such thing. Rather, as Father states, it simply stands for the proposition that "[w]hen the [CHINS] adjudication *can* involve both

---

[2] The record suggests that the trial court denied Father's request to hear evidence on the custody petition based partly on the fact that Mother had not retained counsel in the custody proceeding and objected to Father being granted full custody of Child, as well as on the guardian ad litem's concerns about Father's "mental state" and DCS's concerns about having a "professional's feedback on [Father's] parenting." Tr. at 9, 12. Father's counsel noted that even if a hearing on the custody petition was delayed,

> the issue is still going to be the same. The services won't be necessary to protect the child and this Court has in the past changed custody […] when there is an open CHINS case and we have a child where you know, the relationship isn't for the past so many years, but, there are no services necessary for father to protect the child.
>
> [….]
>
> [I]f you find that there is no … CHINS then there is still not any mechanism necessary to close the case because [Father] wouldn't have custody. So [the CHINS determination and the custody determination] would still need to kind of occur at the same time.

*Id.* at 13-14. As Father's counsel predicted, DCS failed to establish a basis for a CHINS finding as to Father.

parents at the same time, it *should* involve both parents at the same time so there is one adjudication as to all facts pertaining to the entire matter." Appellant's Response at 6 (emphases added).[3] If multiple hearings are unavoidable, then the trial court should, if at all possible, refrain from adjudicating the child a CHINS until evidence has been heard from both parents. And if an adjudication is unavoidable before evidence has been heard from the second parent, then the trial court must give meaningful consideration to the evidence provided by the second parent in determining whether the child remains a CHINS.

[13] With these clarifications, we hereby reaffirm our original decision in all respects.

Mathias, J., concurs.
Riley, J., would deny petition for rehearing.

---

[3] We are fully aware, as DCS states, that a court "shall complete" a factfinding hearing on a CHINS petition not more than sixty days after the petition is filed, with a sixty-day extension permissible if all parties consent, and that the court "shall dismiss the case without prejudice" upon motion if those deadlines are not met. Ind. Code § 31-34-11-1.