## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 27 2017, 9:19 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Amy Karozos
Greenwood, Indiana

ATTORNEYS FOR APPELLEES

Curtis T. Hill, Jr.
Attorney General of Indiana

Andrea E. Rahman
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of S.C., A Minor Child, A Child In Need Of Services,

M.L., Father, *Appellant-Respondent*,

v.

The Indiana Department of Child Services, *Appellee-Petitioner*,

and

Child Advocates, Inc., *Appellee-Guardian Ad Litem*.

October 27, 2017

Court of Appeals Case No.
49A05-1704-JC-751

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge

The Honorable Jennifer Hubartt, Magistrate

Trial Court Cause Nos.
49D09-1606-JC-2202
49C01-1606-JP-22362

**Brown, Judge.**

[1] M.L. ("Father") appeals from the trial court's determination that S.C., born on January 23, 2015, was a child in need of services ("CHINS"). Father raises one issue which we revise and restate as whether the trial court erred by finding that S.C. was a CHINS. We reverse and remand.

*Facts and Procedural History*

[2] On June 22, 2016, E.C. ("Mother") filed a Verified Petition to Establish Paternity of Child and Provide Support, naming either Father or S.S. as the biological father of S.C. According to the June 28, 2016 Intake Officer's Report of Preliminary Inquiry and Investigation, the Department of Child Services ("DCS") received a report of neglect two days later. The report listed S.C. as a victim of alleged perpetrators Mother and S.S. and stated that, while S.C. was in the home, Mother and S.S. were involved in an argument that resulted in Mother shooting S.S. in the head and that S.S. was alive and in the Intensive Care Unit in unstable condition after undergoing surgery for his wounds. The Intake Report also stated that Mother fled the scene with S.C. after the incident, that S.C.'s sibling, R.S., was removed from Mother's care and placed with his maternal aunt, and that S.C. and R.S. (collectively, the "Children") "were taken into custody without a court order." Appellant's Appendix Volume 2 at 32 (emphasis removed).

[3] On June 28, 2016, DCS filed a verified petition alleging that the Children were CHINS, that Mother and S.S. failed to provide the Children with a safe, stable, and appropriate living environment free from domestic violence, and that S.S. was the father of S.C. The petition alleging that the Children were CHINS is

pursuant to Ind. Code § 31-34-1-1, and the Children's "physical or mental condition" was "seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision." *Id.* at 29.

[4]     On August 18, 2016, the court held a fact-finding hearing for Mother on the CHINS petition, and Mother entered an admission that the Children were CHINS. When Mother's counsel shared at the hearing that Mother "has named [S.S.] as one of the . . . alleged father [sic] on the paternity case as well," counsel for DCS asked if "bundling would be appropriate so that [the court] would be able to determine paternity." Transcript at 59-60. The court voiced concern and stated "one alleged father [is] here and there's another alleged father downtown without any real communication," and that its intention was "to try to reach paternity Court [sic] and get that case before [August 22]. So that way, we can take a look to see what's going on." *Id.* at 60. At the hearing, counsel for DCS also questioned "whether it's still possible . . . to add [Father] as a potential father in this hearing" so that the DCS family case manager could serve Father at the paternity case hearing on August 22. *Id.* On August 26, 2016, the paternity court ordered causes 49C01-1606-JP-22362, concerning Father's paternity over S.C., and 49D09-1606-JC-2202, concerning the CHINS case, "now transferred to Juvenile Division, and are 'bundled' for purposes of pretrial motion and trial" pursuant to Marion Superior Court, Civil Division Rule 76.2. Appellant's Appendix Volume 2 at 239.

[5] On September 9, 2016, DCS filed an amended verified CHINS petition, naming both S.S. and Father as alleged fathers of S.C. and alleged that S.C. was a CHINS pursuant to Ind. Code § 31-34-1-1.

[6] On September 22, 2016, the court ordered both S.S. and Father to provide a DNA sample to establish paternity of S.C. The results, reported on September 29, 2016, were discussed at the October 6, 2016 Pre-Trial Hearing, and the court noted that Father "could not be ruled out as the alleged father of [S.C.]." Transcript at 85. When the court asked counsel for DCS about the placement of S.C., counsel stated, "Obviously, as [Father] is the biological father. If he had appropriate placement, he would be our first choice, but we are willing to explore kinship care since the child is currently in foster care." *Id.* at 87. The court also stated that Father has a right to parenting time. *Id.* at 91. Following the hearing, the court ordered that S.S. be "dismissed from [the CHINS] action based on the DNA results indicating that he is not the biological father of [S.C.]." Appellant's Appendix Volume 2 at 150.

[7] On October 27, 2016, another Pre-Trial Hearing was held regarding Father. His counsel shared that Father's intention was

> to ask [the court] to establish paternity of the child and to seek placement with him. He indicates he's got an appropriate home. He's got custody of another child. His [fiancée] and her son live there with him. He indicates that she has no criminal or DCS history. Now that he knows that this is his child, which he did not know before, he is seeking to get custody.

*Id.* at 94. When the court asked for a response from counsel for DCS, counsel stated DCS was "beginning the process of looking on whether [Father's] home is appropriate. In the case that it is, we would have no objection to placement, but at this time, we're not able to provide a position on that." *Id.* After noting waiver of all time requirements, the court stated that it would conduct "one Final Pre-Trial" on December 1, 2016. *Id.* When Father's counsel asked for "authorization for placement with [Father] at this time," counsel for DCS stated DCS had "no objection to authorization upon positive recommendation." *Id.* at 95. Guardian ad Litem Mary Browne ("GAL Browne") stated "I'd like to hear the results of DCS' [sic] check of the home. I don't know anything about the other child or the other case. So, pending that, I would have a problem with authorization," and the court noted that it was "going to hold on the authorization. When DCS has the authorization regarding the environment that [S.C.] would be placed in, if the recommendation is for placement with [Father], I would certainly entertain that via formal motion." *Id.* at 95-96.

[8] On November 22, 2016, DCS filed an Affidavit that "respectfully requests placement of [S.C.] with his biological father [Father]"; that at court "on 10/27/16, the court authorized supervised parenting time for [Father] and [S.C.] [They] have been visiting twice weekly. Visits are reported to be going well and there are no safety concerns"; the family case manager "checked out [Father's] home on 10/31/16. The home was appropriate. There was plenty of food and the home had working utilities"; and that, due to visits going well

between them and S.C. being placed in respite care from 11/24/2016 to 12/8/2016 because his foster family will be traveling to Florida, "DCS is requesting placement of [S.C.] with [Father]." Appellant's Appendix Volume 2 at 157. The following day, DCS filed a Request for Change of Placement, which states in part that "[o]n or about August 11, 2016, the child's placement in relative care disrupted and the child was moved to foster care," that Father was in favor of this change placement and GAL Browne was in agreement with the motion, and that DCS had "secured a placement in [temporary in-home trial visitation] with [Father] that is able to care for the child." *Id.* at 184. The court granted the request and set a Placement Review hearing for December 22, 2016.[1]

[9] The court held the final Pre-Trial Hearing on December 1, 2016, and decided on dates for Mediation and Fact Finding, setting them on January 30, 2017 and February 9, 2017 respectively. At the hearing, counsel for Father stated that "[Father] needs to establish paternity and I think he wants to pursue custody outside of these CHINS proceedings. I don't know if we need to make a request to the Court and have that bundled and then it's filed or how that works," to which the court responded negatively, stating "there is already a paternity action here." Transcript at 100.

---

[1] At the December 22, 2016 CHINS placement review hearing, counsel for DCS stated the Children "are doing well and both placed with their fathers. There's no safety concerns at all for either placement," and GAL Browne likewise stated "both children are doing well. We have no safety concerns in either home." Transcript at 103.

At the February 9, 2017 Fact Finding hearing, Father's counsel asked the court to "enter a Decree of Paternity under the open Paternity case that has been bundled with this case. . . . [Father] did DNA. He was determined to be the father of this child. The child has been placed with him since November 23, 2016." Supplemental Transcript at 2. Father stated there was no agreement as to custody and the court responded,

> I am unable to order an issue regarding custody if there is not an agreement and if there has not been sufficient time to remedy the situation. . . . There's been recent case law that says that I'm unable to do that. Now I understand the dynamics. It's not as if [Mother] is unable to appropriately parent as to this date, but I am inclined to issue an order on custody without having set that matter for a custody hearing and provided ample opportunity for [Mother] to respond.

*Id.* at 3. Also at the February 9 hearing, Father's counsel submitted a written stipulation of facts,[2] and added,

---

[2] The stipulated facts state in whole:

1. [S.C.] is a minor child born January 23, 2015.
2. A paternity action was initiated under 49C01-1606-JP-022362 by [Mother], alleging that [Father] was the father of the child.
3. DNA results confirm that [Father] is the father.
4. The paternity case has been bundled with this child in need of services case.
5. No decree of paternity has been issued at this time.
6. The Department of Child Services filed a petition alleging neglect because Mother was not providing the child a safe and appropriate home free from domestic violence.
7. The child was placed with his father . . . on November 23, 2016.
8. The child has remained in the care of his father since that time and the Department of Child Services has no safety concerns for the child in the care of his father.
9. On August 18, 2016, the child's mother admitted that she could not care for the child due to being incarcerated and that the child was in need of services.
10. The child's mother . . . remains incarcerated and pending charges of attempted murder, a level 1 felony, with a current jury trial date of April 10, 2017.

> As far as the [CHINS] case, what I know one of your colleagues has done was take that under advisement until there was a hearing scheduled on the custody. . . . We would simply submit the stipulation of facts and leave it to the Courts [sic] discretion to whether they find this child to be a child in need of services.

*Id.* at 4. When asked whether there was "any additional testimony that counsel[s] wish to present," counsel for Father answered in the negative, stating "as far as DCS and I, that would be the entirety of the evidence." *Id.* at 5. "Having reviewed the stipulations," the court continued the adjudication of S.C. and stated it would "show that he is in need of services based on the current situation, the current case law and my inability to set the matter for a Custody hearing pursuant to that case law." *Id.* Counsel for Father stated that DCS was not requesting any services, and counsel for DCS confirmed that it was not requesting any "at this time." *Id.*

[11] On March 13, 2017, the court issued an order regarding the findings of fact from the February 9, 2017 hearing. The court noted in the order that Mother "has not had the required reasonable opportunity to participate in reunification services under the CHINS matter. Therefore, the Court declines to entertain a change of custody at this time." Appellant's Appendix Volume 2 at 211. The court also found:

---

11. If, and only if, a paternity decree is issued and custody of the child is awarded to [Father], the Department of Child Services would have no safety concerns for the child and would dismiss the Child in Need of Services case as to [S.C.].

Appellant's Appendix Volume 2 at 206.

After review of the stipulated facts, the Court makes the following findings:

1. [Mother] is currently in the Marion County Jail awaiting a jury trial on pending charges of attempted murder. [Mother's] current trial date is April 10, 2017.

2. [Mother] has already admitted that [S.C.] is a child in need of services.

3. [Father] has been determined to be the biological father of [S.C.].

4. [S.C.] has been placed in the care of his father since November 23, 2016. The DCS has no concerns for the safety of [S.C.] in the care of his father.

5. [Father] is not the custodial parent of [S.C.] at this time.

6. The status of [S.C.] is that his custodial parent, [Mother], is currently in the Marion County Jail and is unable to parent.

7. While there are no concerns for [S.C.] in [Father's] care, [Father] is not the child's custodial parent and does not have the legal ability to independently provide for all of his needs.

8. While this Court may arguably be in the position to provide [Father] with this legal ability through an order granting him custody under the paternity action, to do so at this stage would be in violation of [Mother's] due process rights under the paternity matter.

9. Additionally, a change in custody would deprive [Mother] of the reasonable opportunity to work toward reunification and would be in contravention of the policy and purpose of a Child in Need of Services action as stated in Indiana statute and reiterated in recent case law.

A Child in Need of Services action pertains to the status of the child, not fault on the part of the parents. [S.C.] is a child without a parent who is both legally able and physically available to provide him with care. Therefore, the Court continues the adjudication that [S.C.] is a child in need of services.

*Id.* at 211-212.

[12] On the same day, the court issued a Dispositional Order, which found in part that the order "reflects the events of the hearing conducted on February 9, 2017. DCS has no recommendation for any active services on the part of [Father]. As such, the Court orders no services for [Father]. As the child is in [Father's] care, the Court orders no child support at this time." *Id.* at 218.

[13] On July 20, 2017, a CCS entry was recorded in cause 49C01-1606-JP-22362, which states

> Transfer Case
> Order Signed: 07/17/2017
>> Mother is incarcerated. Court orders no child support at this time. Father will have physical and legal custody of the child. Mother will have phone contact with the child at the discretion of [Father] will claim as a dependent for the purposes of state and local taxes. Father to provide health insurance. The court orders this matter transferred to the Marion Circuit Court Paternity Divi[s]ion for all future matters[.]

Order, July 17, 2017; *see also* Cause No. 49G03-1606-F1-02500, Order of Commitment to Community Corrections, April 18, 2017 (detailing Mother's incarceration).

### *Discussion*

[14] Although the July 17, 2017 Order granting Father physical and legal custody of S.C. may make the appeal before us moot, we conclude a decision on the merits is warranted and necessary. A CHINS adjudication, even one that is short-

lived and naturally resolved by the case's circumstances, may jeopardize future family stability. *See* Ind. Code § 31-35-2-4(b)(2)(B)(iii) (providing that two separate CHINS adjudications may serve as the basis for a petition to terminate parental rights). If the adjudication is indeed erroneous, it must be corrected to protect the integrity of the family moving forward. *Matter of N.C.*, 72 N.E.3d 519, 524 (Ind. Ct. App. 2017) (quoting *In re K.D.*, 962 N.E.2d 1249, 1259 (Ind. 2012) ("[A]n abundance of caution should be used when interfering with the makeup of a family and entering a legal world that could end up in a separate proceeding with parental rights being terminated.")).

[15]    The issue before us is whether the trial court's adjudication of S.C. as a CHINS was clearly erroneous. In reviewing a CHINS determination, we do not reweigh evidence or assess witness credibility for ourselves. *In re S.A.*, 15 N.E.3d 602, 607 (Ind. Ct. App. 2014), *aff'd on reh'g*, 27 N.E.3d 287, *trans. denied*. We consider only the evidence in favor of the juvenile court's judgment, along with any reasonable inferences arising therefrom. *Id.*

[16]    The juvenile court entered findings of fact and conclusions in its March 13 order adjudicating S.C. a CHINS. For issues covered by the juvenile court's findings, we first consider whether the evidence supports the factual findings and then consider whether those findings support the juvenile court's judgment. *In re S.A.*, 15 N.E.3d at 607. We will not set aside the findings or judgment unless they are clearly erroneous. *Id.* Findings are clearly erroneous when there are no facts in the record to support them; a judgment is clearly erroneous if it relies on an incorrect legal standard. *Id.* We give substantial deference to

the court's findings but not to its conclusions. *Id.* Any issues not covered by the findings are reviewed under a general judgment standard and the judgment may be affirmed if it can be sustained on any basis supported by the evidence. *Id.*

[17]     Father argues that DCS proved neither that the child's physical or mental condition was seriously impaired or endangered nor that the child needed care, treatment or rehabilitation that he was not receiving. Specifically, Father argues that DCS failed to identify a danger to the child's physical or mental condition or provide an allegation that Father failed to provide S.C. with necessary food, clothing, shelter, medical care, education or supervision. Father argues next he was doing all he could to ensure he took care of his son and the law does not favor subjecting families to a CHINS finding where parents are willing and able to take care of their children. In his reply, Father asserts that, since both the paternity and CHINS case were before it, the court could have entered a custody order in the CHINS action, entered the paternity decree and awarded initial custody, or taken the CHINS under advisement until the paternity decree and custody order was issued.

[18]     DCS argues that the court properly found that S.C. was a CHINS because there was no custody order which would allow Father to properly care for S.C. Specifically, DCS argues there was no paternity decree or custody order which legally allowed Father to act on behalf of the Child regardless of the DNA testing that indicated Father was S.C.'s biological parent, that a change of custody for Father could not be accomplished without holding a hearing in

which Mother was provided the opportunity to challenge Father's motion, and that Father could not make decisions on behalf of S.C. without a change of custody determination.

[19] To adjudicate a child a CHINS, DCS must prove by a preponderance of the evidence that

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent . . . to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
>> (A) the child is not receiving; and
>>
>> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

[20] Ind. Code § 31-34-1-1.  A CHINS designation focuses on the condition of the child rather than on an act or omission by the parent.  *In re N.E.*, 919 N.E.2d 102, 106 (Ind. 2010) ("Said differently, the purpose of a CHINS adjudication is to protect children, not punish parents."); *see also J.C. v. Indiana Dept. of Child Services*, 3 N.E.3d 980, 982 (Ind. Ct. App. 2013).  DCS must prove three elements for a juvenile court to adjudicate a child as a CHINS; it must first prove the child is under the age of eighteen, it must prove one of eleven different statutory circumstances exist that would make the child a CHINS, and finally, in all cases, DCS must prove the child needs care, treatment, or

rehabilitation that he or she is not receiving and that he or she is unlikely to be provided or accepted without the coercive intervention of the court. *In re K.D.*, 962 N.E.2d at 1253. The final element reserves the coercive intervention of the court into the family and "guards against unwarranted State interference in family life, reserving that intrusion for families 'where parents lack the ability to provide for their children,' not merely where they 'encounter difficulty in meeting a child's needs.'" *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014) (quoting *Lake Cnty. Div. of Family & Children Servs. v. Charlton*, 631 N.E.2d 526, 528 (Ind. Ct. App. 1994)). A CHINS adjudication "may not be based solely on conditions that no longer exist. The trial court should also consider the parents' situation at the time the case is heard." *K.B. v. Indiana Dep't of Child Servs.*, 24 N.E.3d 997, 1001 (Ind. Ct. App. 2015) (citing *In re R.S.*, 987 N.E.2d 155, 159 (Ind. Ct. App. 2013)).

[21] DCS did not prove by a preponderance of the evidence that the "care, treatment, or rehabilitation" that S.C. was and had been receiving from Father during the three months prior to the February 9th hearing necessitated the coercive intervention of the trial court. *See* I.C. § 31-34-1-1. The written stipulation of facts submitted to the court involved eleven factual statements, one of which states that Mother initiated a paternity action alleging Father is the biological father of S.C. and another of which states that DNA results confirm this allegation. More importantly, besides the procedural recitations found in the fourth, sixth, and ninth statements, the only reference in the written stipulation of facts to the CHINS case was DCS's concession that, going

forward, it "would have *no* safety concerns for the child and would dismiss the [CHINS] case" as to S.C. pending paternity and custody decrees being awarded. Appellant's Appendix Volume 2 at 206 (emphasis added). And, the only non-procedural references to S.C.'s current or future situation, contained in the seventh and eighth statements, stipulate that S.C. was placed with Father since November 23, 2016, and DCS has had no safety concerns for S.C. during this period.

[22] To the extent that the evidence may have at one point previously supported a conclusion that the coercive intervention of the court was necessary in the CHINS proceedings, the factual findings in the March 13, 2017 order do not support such a conclusion nor is one substantiated by S.C.'s situation on February 9th at the time of the fact-finding hearing. We note that the trial court found in its March 13 order that Father "has been determined to be the biological father of [S.C.]." *Id.* at 211. We find instructive our decision in *Matter of N.C.*, 72 N.E.3d at 524-525. In that case, we reversed a dispositional order after observing that the

> only reference to Father in the juvenile court's findings following the fact-finding hearing was to reiterate that Father is the noncustodial father of N.C., despite testimony at the fact-finding hearing establishing Father had temporary custody of N.C. under a court order, DCS had visited the placement and found it appropriate, and there were no allegations of neglect against Father.

*Id.*

Based upon the record and the trial court's findings that Father was the biological parent of S.C. and DCS had no concerns for the safety of S.C. in Father's care for the previous four-month period, we conclude that the trial court's order finding that S.C. was a CHINS was clearly erroneous. *See id.* at 525 n.5; *see also In re S.A.*, 15 N.E.3d at 610-612 (observing DCS's argument that coercive court intervention was necessary based on father's "lack of prior involvement and parenting skills" and that the child "still doesn't know [father] that well," and rejecting that argument in part because this court presumed a hearing would be held on the father's custody petition in due course if it had not already).

## *Conclusion*

For the foregoing reasons, we reverse the trial court's determination that S.C. was a CHINS.

Reversed and remanded.

Najam, J., and Kirsch, J., concur.