## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 05 2018, 8:08 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jennifer A. Joas
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Marjorie Lawyer-Smith
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of:
Pa.J. and Pi.J. (Minor Children),
Children in Need of Services

and

M.J. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of
Child Services,

*Appellee-Petitioner*

December 5, 2018

Court of Appeals Case No.
18A-JC-495

Appeal from the Dearborn Circuit
Court

The Honorable James D.
Humphrey, Judge

Trial Court Cause Nos.
15C01-1712-JC-158
15C01-1712-JC-159

**Baker, Judge.**

[1] M.J. (Mother) appeals the juvenile court's finding of her two children to be Children in Need of Services (CHINS), arguing that the evidence was insufficient to support that finding. Concluding that the Department of Child Services (DCS) did not prove by a preponderance of the evidence that Mother's children were seriously endangered or that the coercive intervention of the court was necessary to ensure their care, we find that the juvenile court erred by adjudicating them to be CHINS. Accordingly, we reverse and remand.

# Facts[1]

[2] Mother and K.J. (Father)[2] have two children: Pa.J., born in 2009, and Pi.J., born in 2013. On July 23, 2017, Father called Mother to pick up the children; Mother and Father apparently lived separately at this time. When Mother arrived, the two began arguing, and when the children were in Mother's vehicle, Father shut the car door on Pi.J.'s leg. Mother immediately took her to the emergency room. Pi.J. had "just bruising and just a little swelling." Tr. Vol. II p. 9. Father was arrested and charged with Level 5 felony battery and Level 5 felony neglect of a dependent. In addition, a protective order was filed against him for Mother and a no-contact order was filed against him for the children.

---

[1] We note that the State's brief's statement of facts improperly contains several assertions that were not testified to or admitted as evidence during the fact-finding hearing. Moreover, the State omits a key fact—the extent of the child's injury that apparently led to this case.

[2] Father is not a party to this appeal.

[3] Following the incident, DCS received a report of neglect and physical abuse for the children. About a week or two after the incident, Family Case Manager (FCM) Charlotte Franklin went to their home for a follow-up visit. Pi.J. said that her leg was "all better," and FCM Franklin did not observe any problems with the child's walk. *Id.* at 8. Pa.J. also "seemed to be good." *Id.*

[4] At some point, DCS offered the parents a program of informal adjustment, which Mother accepted.[3] On November 8, 2017, FCM Katherine Elliott visited the home. During the visit, Mother stated that, six days earlier, she dropped the no-contact order against Father; around that same time, she also dropped the protective order against him. Father was present during FCM Elliott's visit, though under the informal adjustment he was not supposed to be there. He did not interact with FCM Elliott during her visit.

[5] On November 15, FCMs Franklin and Elliott visited the residence; Father was there again, this time asleep on the couch and unable to be woken up. The FCMs observed alcohol in the house. They spoke with Mother about the importance of Father's involvement and compliance with an informal adjustment if he was going to be in the house and around the children. Mother expressed concern that she was compliant with the services and could not control Father's actions. FCM Elliott had been unsuccessful in getting in touch

---

[3] Apparently, the informal adjustment deteriorated before it was formally approved by the trial court.

with Father, partly because the family did not tell DCS that they had moved to a new apartment across the hall.

[6] On December 8, 2017, DCS filed a petition alleging the children to be CHINS because Mother did not comply with the informal adjustment program. The petition alleged that the children were CHINS because Father had "slammed the door while [Pi.J.'s] foot was still hanging outside the car, effectively injuring her"; there was "a history of domestic violence in the home"; Father had been arrested and charged with two felonies, and protective and no-contact orders had been filed against him; the no-contact order had been removed and Father had returned to the home with Mother and the children; FCM Elliott had witnessed Father unconscious and unable to be woken up; and one of the children had stated that she was scared when her parents drink. Appellant's App. Vol. II p. 21. An initial hearing took place that same day, after which the juvenile court ordered that the children remain in Mother's home, that Father could have no unsupervised contact with the children, and that both parents had to submit to a drug screen immediately following the hearing. Sometime after DCS filed this petition, Mother and Father separated because Mother was "tired of his behavior." Tr. Vol. II p. 19.

[7] Sometime after the initial hearing, FCM Elliott referred the parents for services, including home-based casework, parenting sessions, and a batterer's group for Father. Mother was compliant with services; Father was "reluctantly compliant" and would get upset when supervised visits did not happen as fast as he would like. *Id.* at 16.

On January 18, 2018, a fact-finding hearing took place. At this time, the home-based casework service and supervised visits for Father had started, and each parent had completed mental health assessments and substance abuse evaluations. On January 29, 2018, the juvenile court issued an order finding the children to be CHINS, making the following findings of fact and conclusions of law:

> 6. The Department offered the family a Program of Informal Adjustment. Before the IA was approved, mother requested that the protective order and no-contact order against father be dropped.

> 7. Immediately following the dismissal of the protective order, father became non-compliant and unresponsive when interacting with FCM Franklin.

> 8. FCMs Franklin and Elliott visited the home on two occasions and had some concerns regarding father's lack of compliance. First, father refused to acknowledge the FCMs' presence when they visited because he was playing a video game. On the second occasion, FCMs Franklin and Elliott observed father passed out on the couch and mother physically trying to wake him and push him into a sitting position, without succeeding.[4]

---

[4] We note that during the fact-finding hearing, FCM Elliott testified that it "was under the informal adjustment that [Father] would not be within the household, so, no, he was not required to speak with me, but it was assumed he wouldn't be in the household." Tr. Vol. II p. 20. She also testified that Father was not under a court order to speak with her. Further, there was no testimony or evidence admitted regarding Father playing a video game when the FCMs visited the home.

9.  While mother is completely compliant with services, father is reluctantly working with the Department.

10.  Father has been aggressive in his interactions with FCM Elliott, at one point threatening to take his children and leave the state.

11.  Mother admitted to FCM Elliott that she and father are no longer together, due in part to father's unwillingness to cooperate with the Department.

12.  Father's lack of willingness to comply with the Department, father's pending criminal charges, and mother's admission that father isn't completely cooperative proves by a preponderance of the evidence that [Pa.J. and Pi.J.] are children in need of services.

Appealed Order p. 2.  Mother now appeals.

# Discussion and Decision

## I.  Standard of Review

Our Supreme Court has explained the nature of a CHINS proceeding and appellate review of a CHINS finding as follows:

> A CHINS proceeding is a civil action; thus, "the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010).  We neither reweigh the evidence nor judge the credibility of the witnesses. *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992).  We consider only the evidence that supports the trial court's decision and reasonable inferences drawn therefrom. *Id.*  We reverse only

upon a showing that the decision of the trial court was clearly erroneous. *Id.*

> There are three elements DCS must prove for a juvenile court to adjudicate a child a CHINS. DCS must first prove the child is under the age of eighteen; DCS must prove one of eleven different statutory circumstances exist that would make the child a CHINS; and finally, in all cases, DCS must prove the child needs care, treatment, or rehabilitation that he or she is not receiving and that he or she is unlikely to be provided or accepted without the coercive intervention of the court. *In re N.E.*, 919 N.E.2d at 105.

*In re K.D.*, 962 N.E.2d 1249, 1253-54 (Ind. 2012) (footnote omitted).

[10] Here, DCS alleged that the Children were CHINS pursuant to Indiana Code section 31-34-1-1, which provides as follows:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:

>> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

>> (2) the child needs care, treatment, or rehabilitation that:

>>> (A) the child is not receiving; and

> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

The purpose of a CHINS inquiry is to determine whether a child's circumstances require services that are unlikely to be provided without the intervention of the court, and thus, the focus of a CHINS adjudication is on the condition of the child alone, not on the culpability of one or both parents. *In re N.E.*, 919 N.E.2d at 105-06. Nonetheless, "[n]ot every endangered child is a child in need of services, permitting the State's *parens patriae* intrusion into the ordinarily private sphere of the family." *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014). Rather, a CHINS adjudication under section 31-34-1-1 requires proof of three basic elements: the parent's actions or inactions have seriously endangered the child; the child's need are unmet; and "perhaps most critically," those needs are unlikely to be met unless the State intervenes. *Id.* It is the last element that guards against unwarranted State interference in family life. *Id.* State intrusion is warranted only when parents lack the ability to provide for their children. *Id.* Moreover, when determining whether a child is a CHINS under section 31-34-1-1, and particularly when determining whether the coercive intervention of the court is necessary, the juvenile court "should consider the family's condition not just when the case was filed, but also when it is heard." *Id.* at 1290.

[12] The juvenile court entered findings of fact and conclusions thereon sua sponte in its order adjudicating the children to be CHINS.[5] Our review is therefore governed by Trial Rule 52(A). For issues covered by the juvenile court's findings, we first consider whether the evidence supports the factual findings and then consider whether those findings support the juvenile court's judgment. *In re S.A.*, 15 N.E.3d 602, 607 (Ind. Ct. App. 2014), *aff'd on reh'g*, 27 N.E.3d 287 (Ind. Ct. App. 2015). We will not set aside the findings or judgment unless they are clearly erroneous. *Id.* Findings are clearly erroneous when there are no facts in the record to support them; a judgment is clearly erroneous if it relies on an incorrect legal standard. *Id.* We give substantial deference to the court's findings but not to its conclusions. *Id.* Any issues not covered by the findings are reviewed under a general judgment standard and the judgment may be affirmed if it can be sustained on any basis supported by the evidence. *Id.*

## II. CHINS Adjudication

## A. Subsequent Events

[13] On April 27, 2018, after this appeal was initiated, DCS requested that the children's wardship be terminated, and the request was granted that same day. Although the wardship was terminated, this appeal is not moot; a decision on the merits is warranted and necessary. A CHINS adjudication, even one as short-lived as this one, can have serious consequences for families. Indiana

---

[5] A CHINS fact-finding order is not required to include formal findings. *In re S.D.*, 2 N.E.3d at 1288.

Code section 31-35-2-4(b)(2)(B)(iii) provides that two separate CHINS adjudications can be the basis for a petition to terminate parental rights. Although the Children are not currently CHINS, it is still on record that they have been adjudicated CHINS and if that adjudication was erroneous, it must be corrected to protect the integrity of the family going forward. *See In re K.D.*, 962 N.E.2d at 1259 (noting that "an abundance of caution should be used when interfering with the makeup of a family and entering a legal world that could end up in a separate proceeding with parental rights being terminated").

## B. Serious Endangerment

[14] Mother first contends that the evidence does not prove that the children's physical or mental condition was seriously impaired or endangered by either parent's action or inaction. DCS initially became involved with this family after Father shut a car door on Pi.J.'s leg. The record reveals that Mother took Pi.J. to the emergency room immediately after this incident; the child's injuries consisted of some bruising and swelling. FCM Franklin observed no problems with Pi.J. during a follow-up visit to the family. The record contains no evidence that this incident was intentional or that it was anything but an isolated occurrence.

[15] FCM Elliott testified during the fact-finding hearing that she had no concerns about Mother or the children's safety. The State's closing argument consisted solely of the contention that DCS filed a CHINS petition because Father was not participating with services, and that Father began and continued to

participate in services only because the formal CHINS proceeding was open. In other words, the State failed to point to any evidence to show that the children were seriously endangered.

[16] The record shows that Mother was meeting the children's needs for food, clothing, shelter, medical care, education, and supervision. Mother's employment is stable, having worked for the same employer for most of a decade; Mother also has acceptable housing, transportation, and health insurance for the children. Pa.J. goes to school, and Pi.J. goes to work with Mother, with Mother's employer's permission.

[17] Although the State points to several facts to support the juvenile court's conclusion, we do not find these facts persuasive. First, the State notes that Mother reported a history of domestic violence and alcohol abuse between the parents. Yet the juvenile court did not make findings of fact on either of these points. The only evidence in the record regarding domestic violence was FCM Franklin's testimony that Mother stated that Mother and Father "have gotten physical and verbally abusive." Tr. Vol. II p. 11. FCM Elliott then testified that she thought DCS had received reports of those allegations, but she did not know whether any reports had been substantiated. This brief testimony is far too vague and indefinite to support a finding that the children were seriously impaired or endangered by any domestic violence. Regarding any history of alcohol abuse, we fail to find support for this contention in the record. Instead, FCM Elliott testified that Mother had said that she and Father do not drink at the same time to prevent arguments between them. In short, the facts do not

support a finding that the children were seriously impaired or endangered because of either parent's actions.[6]

## C. Need for Coercive Intervention of the Court

[18] We turn now to Mother's argument that the State's coercive intervention was not necessary to ensure that the children's needs would be met. We agree.

[19] Mother initially asserts that the juvenile court's findings regarding Father are not relevant to her appeal. But a CHINS adjudication turns on the children's conditions, not on the culpability of one or both parents. *In re N.E.*, 919 N.E.2d at 105. And we find that Mother and Father are linked in the few problems that exist in this case, including Mother's request to have the protective order and no-contact order dropped, Mother's decision to allow Father in the home with the children even though he was not supposed to be there during the informal adjustment, and the parents' decision to move apartments without notifying DCS of their new address. Under these circumstances, we find that the juvenile court's findings regarding Father are relevant. We also find, however, that these relatively minor problems do not establish that the children's needs were not being met or that the children had needs that were unlikely to be met without the State's coercive intervention. As noted above, Mother was meeting

---

[6] The State's argument also improperly relies on several facts that were not part of the fact-finding hearing; we decline to consider these facts in our analysis.

the children's needs and was fully compliant throughout the course of these proceedings.

[20] The State argues that a CHINS finding is necessary because Father was only reluctantly complying with services at the time of the fact-finding hearing. However, Father was not under a court order to participate before the CHINS finding was made. Moreover, nothing in the record indicates that he did not participate with proffered services before that finding was made; the record also does not reveal any problems with Father when he participated with those services. The State also relies on the fact that the parents had an on-again, off-again relationship, but we cannot say that an evolving relationship on its own is enough to warrant coercive intervention. The State simply fails to show that services are necessary for these parents or that the children's needs will not be met if services are not ordered. Accordingly, the State failed to prove by a preponderance of the evidence that the coercive intervention of the State was necessary to ensure the children's well-being.

[21] In sum, because the State failed to prove each element required by statute to show that a child is a CHINS, the juvenile court erred by adjudicating the children to be CHINS.

[22] The judgment of the juvenile court is reversed and remanded.

May, J., and Robb, J., concur.