

**FILED**

Sep 02 2015, 8:49 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Patricia Caress McMath
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of D.B. (Minor Child), a Child in Need of Services:

D.B. (Father),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

and

Child Advocates, Inc.

*Co-Appellee (Guardian ad Litem)*

September 2, 2015

Court of Appeals Case No. 49A02-1501-JC-48

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge
The Honorable Danielle E. Gaughan, Magistrate

Trial Court Cause No. 49D09-1408-JC-1714

**Baker, Judge.**

A two-year-old child's mother was murdered by the child's father figure. The child's actual father lives out of state and is a virtual stranger who has had very little contact with Mother. But that fact, alone, is insufficient to support a finding that the child is a child in need of services (CHINS). Likewise, the fact that the Department of Child Services (DCS) was unable to gather sufficient information about the father's fitness as a parent does not meet DCS's burden to prove him unfit. We also find that the statutory framework related to placement of children in other states does not apply when the contemplated placement is with a biological parent. Consequently, we reverse the juvenile court's order finding this child to be a CHINS.

# Facts

D.B. (Child) was born out of state to D.B. (Father) and C.H. (Mother) on August 28, 2012. Father was present at Child's birth, signed a paternity affidavit, and was involved in Child's life for approximately four months. When Child was four months old, Mother and Child moved to Indianapolis. Father did not relocate with them and now lives in Minnesota.

After Mother and Child moved to Indianapolis, Father had little contact with his daughter. He sent money to Mother when she requested it but did not provide regular child support. Father alleges that Mother prevented him from seeing or having contact with Child on a regular basis and that she blocked his phone number, preventing him from calling to check in on Child. At the time

the CHINS petition was filed, the last time Father had seen Child was in July 2013.

[4] In August 2014, Mother and Child were living with Mother's boyfriend, J.H., and the five-month-old son of Mother and J.H. On August 10, 2014, Mother was shot and killed by J.H. in their home. J.H. then shot himself and later died as a result of the gunshot wound. Child and her half-brother were in the home when the shootings occurred.

[5] DCS removed both children on August 10 and filed a petition alleging that Child and her half-brother[1] were CHINS on August 12, 2014. Child was placed in kinship care with her godmother. At that time, Father's whereabouts were unknown. Approximately one week later, Father contacted DCS and then appeared for an initial hearing on August 22, 2014.

[6] In September, DCS began the process set forth by the Interstate Compact on the Placement of Children (ICPC) for both Father and Child's maternal grandmother, who lives in Illinois. At the time of the factfinding hearing, the ICPC process had not yet been completed for Father.

[7] On October 6, 2014, the juvenile court held a factfinding hearing regarding Child. Following the hearing, the juvenile court found that Child was a CHINS. Among other things, the court found as follows:

---

[1] The son of Mother and J.H. is not part of this appeal.

6.     Prior to the CHINS being filed Father did not see [Child] very often. He last saw her on July 4, 2013 so he had not seen [Child] in over a year. Prior to July 4, 2013, Father had [Child] in his care while Mother was in a shelter for a few months. He was also present when [Child] was born. After Mother moved to Indianapolis when [Child] was 4 months old, Father did not see [Child] until July 4, 2013.

7.     Father has had three supervised visits of 3 hours each with [Child] since the filing of the CHINS petition.

8.     By his own admission, Father has never paid child support and only sent Mother money when she asked.

9.     Father is living in Minnesota with his girlfriend and her child in an apartment. He has lived with his girlfriend for over a year but his name is not on the lease.

10.     Father was unable to appear in court today but participated telephonically because he could not miss work today. Father has no real plan for daycare in the event that [Child] was placed with him immediately.

11.     Father is presently employed with Creative Care Resources and has worked there for approximately 6 months. Depending on his hours, Father nets approximately $1200 every two weeks.

***

16.     MCDCS has limited information regarding Father. Background checks have not been completed on Father or his girlfriend, and a home study has not been completed.

17. Transition of [Child] to Father's care will require a gradual transition so as not to further traumatize a very young child that has suffered a horrific loss only two months ago. If Father is approved through the ICPC process, the transition needs to be gradual so that Father and [Child] can establish a bond and so that any services[,] whether it be therapy for [Child] or services for Father[,] can be completed.

***

19. . . . [Child] has suffered the traumatic loss of Mother. Father, at the time of Mother's death, had not seen [Child] in over a year. Clearly, given her age, he had no relationship with her. [Child] is bonded to her godmother and bonded to her maternal grandmother and to uproot her suddenly and completely would cause serious emotional harm to her. Absent the results of the ICPC or background checks and a home study, [Child's] safety with Father cannot be determined. To suddenly send [Child], a child whose Mother has been murdered by her sibling's father just two months ago, to Minnesota with a man that may be her father but who has not participated in her life would be another traumatic event in her young life that could only cause her greater harm. [Child] would be separated from her godmother, her grandmother and her sibling, the only remaining constants in her life. Any transition to Father[] needs to be gradual to ensure that Father has established a bond with [Child].

Appellant's App. p. 62-64. Father now appeals.

# Discussion and Decision

## I. Application of ICPC to a Parent

First, we must consider Father's argument that the ICPC does not apply to placement of a child with her biological parent. This is an issue of statutory interpretation, to which we apply a de novo standard of review. *N.L. v. State*, 989 N.E.2d 773, 777 (Ind. 2013).

An interstate compact is "'an agreement between two or more states, entered into for the purpose of dealing with a problem that transcends state lines.'" *Bester v. Lake Cnty. Office of Family and Children*, 839 N.E.2d 143, 153 (Ind. 2005) (quoting P. Hardy, *Interstate Compacts: The Ties that Bind 2* (1982)). All fifty states are now participating members in the ICPC. *Id.* The broad purpose of the ICPC is to facilitate "cooperation between states in the placement and monitoring of dependent children." *Id.*

Our Supreme Court has observed that "[a]mong the most important safeguards for children, whom it is contemplated will be sent to live with adoptive parents in another state, is the [ICPC]." *In re Adoption of Infants H.*, 904 N.E.2d 203, 207 (Ind. 2009). The conditions for placement required by the ICPC "are designed to provide complete and accurate information regarding children and potential adoptive parents from a sending state to a receiving state and to involve public authorities in the process in order to ensure children have the opportunity to be placed in a suitable environment." *Id.* at 208.

Our General Assembly has explained the purpose of the ICPC as follows:

ARTICLE I. PURPOSE AND POLICY

It is the purpose and policy of the party states to cooperate with each other in the interstate placement of children to the end that:

(a)     Each child requiring placement shall receive the maximum opportunity to be placed in a suitable environment and with a person or an institution having appropriate qualifications and facilities to provide a necessary and desirable degree and type of care.

(b)     The appropriate authorities in a state where a child is to be placed may have full opportunity to ascertain the circumstances of the proposed placement, thereby promoting full compliance with applicable requirements for the protection of the child.

(c)     The proper authorities of the state from which the placement is made may obtain the most complete information on the basis of which to evaluate a projected placement before the placement is made.

(d)     Appropriate jurisdictional arrangements for the care of children must be promoted.

Ind. Code § 31-28-4-1 art. I.[2]

---

[2] DCS cites to and applies a newer version of the ICPC, which is located at Indiana Code section 31-28-6-1. The newer version has substantively and substantially different language than the older version. But the newer version is not effective until thirty-five states have enacted it. I.C. § 31-28-6-1 art. XIV(b). Currently, only ten states have enacted the newer version of the ICPC. *See* http://www.aphsa.org/content/AAICPC/en/NewICPC.html (last visited Aug. 6, 2015). Therefore, the version found in section 31-28-6-1 is not yet effective, and we will apply the version found in chapter 31-28-4

[12]   Father argues that the ICPC does not apply to placement of a child with an out-of-state biological parent.  We agree.  Article III of the ICPC sets forth the conditions for placement out of state:

> (a)   A sending agency may not send, bring, or cause to be sent or brought into any other party state *a child for placement in foster care or as a preliminary to a possible adoption* unless the sending agency complies with each requirement under article III and with the receiving state's laws governing the placement of children.
>
> (b)   Before sending, bringing, or causing any child to be sent or brought into a receiving state *for placement in foster care or as a preliminary to a possible adoption*, the sending agency shall furnish the appropriate public authorities in the receiving state written notice of the intention to send, bring, or place the child in the receiving state. . . .

I.C. 31-28-4-1 art. III (emphases added).  Thus, the plain language of the statute makes clear that the ICPC applies only to the placement of a child in foster care or as a preliminary to a possible adoption.[3]

[13]   DCS contends that "the answer to the question of whether the ICPC applies is circumstantial in nature."  Appellee's Br. p. 18.  To the contrary, the answer to that question is *statutory* in nature.  And the statute quite plainly provides that it

---

to this case.  We express no opinion herein as to the applicability of the newer version of the ICPC to an out-of-state parent.

[3] Article VI also brings the out-of-state institutional placement of a child adjudicated a juvenile delinquent under the purview of the ICPC.  I.C. § 31-28-4-1 art. VI.

applies only to placement in foster care or a preadoptive home. A biological parent is neither of these. Accordingly, we hold that the ICPC does not apply to placement with an out-of-state parent. *E.g., McComb v. Wambaugh*, 934 F.2d 474, 481-82 (3rd Cir. 1991) (holding that the ICPC applies only to "substitutes for parental care" and not to placement with a parent, emphasizing the importance of avoiding "entanglement with the natural rights of families" and highlighting "the limited circumstances that justify a state's interference with family life"); *Ark. Dep't of Human Servs. v. Huff*, 65 S.W.3d 880, 563-64 (Ark. 2002) (holding that the ICPC does not apply to placement with a parent). Therefore, to the extent that the juvenile court's CHINS determination in this case rested on the fact that the ICPC process had not yet been completed with respect to Father, we discount that basis of the adjudication.

## II. CHINS Adjudication

[14] Father next argues that there is insufficient evidence supporting the juvenile court's determination that Child is a CHINS. Our Supreme Court has explained the nature of a CHINS proceeding and appellate review of a CHINS finding as follows:

> A CHINS proceeding is a civil action; thus, "the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *In re N.R.,* 919 N.E.2d 102, 105 (Ind. 2010). We neither reweigh the evidence nor judge the credibility of the witnesses. *Egly v. Blackford County Dep't of Pub. Welfare,* 592 N.E.2d 1232, 1235 (Ind. 1992). We consider only the evidence that supports the trial court's decision and reasonable inferences drawn therefrom. *Id.* We reverse only upon

a showing that the decision of the trial court was clearly erroneous. *Id.*

There are three elements DCS must prove for a juvenile court to adjudicate a child a CHINS. DCS must first prove the child is under the age of eighteen; DCS must prove one of eleven different statutory circumstances exist that would make the child a CHINS; and finally, in all cases, DCS must prove the child needs care, treatment, or rehabilitation that he or she is not receiving and that he or she is unlikely to be provided or accepted without the coercive intervention of the court. *In re N.E.,* 919 N.E.2d at 105.

*In re K.D.*, 962 N.E.2d 1249, 1253-54 (Ind. 2012) (footnote omitted).

[15] Our Supreme Court has cautioned that "[n]ot every endangered child is a child in need of services, permitting the State's *parens patriae* intrusion into the ordinarily private sphere of the family." *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014). Here, DCS alleged that Child was a CHINS pursuant to Indiana Code section 31-34-1-1, which provides as follows:

A child is a child in need of services if before the child becomes eighteen (18) years of age:

(1)   the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2)   the child needs care, treatment, or rehabilitation that:

> (A)  the child is not receiving; and
>
> (B)  is unlikely to be provided or accepted without the coercive intervention of the court.

Our Supreme Court has interpreted this provision to require "three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d at 1287.

[16]   In this case, the following evidence is undisputed:

- Father is Child's biological parent.
- Father has a stable home in which he has been living for over one year. He lives with his girlfriend and her eight-year-old child.
- There is no indication that Father's home is inappropriate.
- Father has stable employment and makes approximately $1200 every two weeks.
- Father has looked into possible childcare facilities for Child should she be placed with him. He also has friends and family members who could help with childcare if the need arose.
- Father wants Child to be placed with him.

It is undeniable that Child has undergone significant trauma in the past year. It could be argued that her "mental condition is seriously impaired or seriously endangered" as a result of that trauma. I.C. § 31-34-1-1(1). But DCS has certainly not proved that her mental and emotional condition is the result of Father's "inability, refusal, or neglect . . . to supply the child with necessary

food, clothing, shelter, medical care, education, or supervision[.]" *Id.* To the contrary, Father is prepared to supply all of those necessities immediately.

[17] It is undeniable that Father has not been a significant presence in Child's life. He should not be lauded as an example of excellent parenting. It is likewise undeniable that he and Child do not really know one another as a result of his parental absence. Moreover, given the trauma already experienced by Child, to remove her from the caregiver she knows and loves and to place her with an unknown caregiver will be an additional trauma. But these facts, alone, do not lead to a conclusion that Father's "actions or inactions have seriously endangered the child[.]" *S.D.*, 2 N.E.3d at 1287; *see also Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (emphasizing that "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents").

[18] As Father is Child's parent, there must be a presumption that he is a fit and capable parent, unless and until DCS proves otherwise by a preponderance of the evidence. DCS's arguments that it did not have sufficient information to determine whether he was a fit and capable parent do not and cannot support a CHINS determination. It is DCS's burden to prove by a preponderance of the evidence that Child would be seriously impaired or endangered in Father's care.

[19] Our Supreme Court recently emphasized this very point in reversing a termination of parental rights order. *In re K.E.*, No. 82S04-1508-JT-491 (Ind. Aug. 20, 2015). In *K.E.*, the child's father was incarcerated but had presented

evidence that once released, he had plans for housing and employment. Our Supreme Court emphasized that DCS had presented no evidence to the contrary:

> we are not persuaded that there is any evidence in the record to contravene Father's statements that upon his release he plans to live with his father (K.E.'s paternal grandfather) and work with him through Vectren. *While Father did not substantiate this claim, DCS did not present any evidence to support a contradictive finding.* No evidence indicates that Father was fabricating his plans for employment or that his father's home is unsuitable for children.

*Id.*, slip op. p. 9 (emphasis added). The Court noted that although DCS contended that Father was unable to prove that he would be able to provide for the child upon release, "it is DCS's burden to show by clear and convincing evidence that each of the elements provided in [the termination of parental rights statute] are met." *Id.*, slip op. p. 9 n.6. In other words, DCS must produce evidence to support its quest to terminate the parent-child relationship or, as in this case, to have a child declared to be a CHINS.

[20] In the instant case, DCS has offered no evidence that Father's residence or employment are in any way unstable. It has offered no evidence that Father is an unfit parent; it merely proved that he has been an absent one. Absent that evidence, DCS has failed to meet its burden.

[21] We acknowledge that there is but a brief timeframe, dictated by statute, between the filing of a CHINS petition and a CHINS factfinding hearing. And we acknowledge the difficulty of gathering information and evidence about an

out-of-state parent. But the simple reality is that DCS bears the burden of proof in CHINS cases, and it is up to DCS to gather the facts and the evidence to support its CHINS petition. In this case, it failed to do so. We can only conclude that there is insufficient evidence in the record supporting the juvenile court's conclusion that Child is a CHINS. Therefore, we reverse.

The judgment of the juvenile court is reversed.

Riley, J., concurs, and Brown, J., dissents with opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of D.B. (Minor Child), a Child in Need of Services: | Court of Appeals Case No. 49A02-1501-JC-48 |
| D.B. (Father), | |
| *Appellant-Respondent,* | |
| v. | |
| The Indiana Department of Child Services, | |
| *Appellee-Petitioner* | |
| and | |
| Child Advocates, Inc. | |
| *Co-Appellee (Guardian ad Litem)* | |

**Brown, Judge, dissenting.**

I respectfully dissent from the majority's conclusion that the ICPC does not apply to an out-of-state placement with a natural parent in all circumstances. In *Bester v. Lake Cnty. Office of Family & Children*, the Indiana Supreme Court observed that whether the ICPC applies to the interstate reunification of

children with natural parents is an open question and that some jurisdictions have concluded the ICPC applies under those circumstances and others have concluded it does not. 839 N.E.2d 143, 146 n.2 (Ind. 2005) (referring to cases holding the ICPC does apply and does not apply to reunification of children with natural parents). The majority here concludes that, based on its language, the ICPC does not apply to placements with out-of-state parents. Slip op. at 8-9. I do not agree that this is always the case based on the language of the ICPC.

[24] The purpose of the ICPC is to facilitate cooperation between participating states in the placement and monitoring of dependent children. *See* Ind. Code § 31-28-4-1, art. I. The majority cites to Article III of the ICPC, related to conditions for placement, and focuses on the language which refers to the transfer of a child "for placement in foster care or as a preliminary to a possible adoption," which does not refer to the situation where a child is being sent to live with his or her natural parent. *See* Ind. Code § 31-28-4-1, art. III. However, this language is not dispositive. Article VIII of the ICPC expressly sets forth the limitations of the ICPC's applicability, and this section does not preclude its application to agency placements with non-resident parents. *See* Ind. Code § 31-28-4-1, art. VIII.[4] Moreover, Article X provides that the provisions of the

[4] Article VIII, titled "Limitations," provides in part:

> This compact shall not apply to:

ICPC "shall be liberally construed to effectuate the [ICPC's] purposes." Ind. Code § 31-28-4-1, art. X. *See Dep't of Children & Families v. Benway*, 745 So.2d 437, 438-439 (Fla. Ct. App. 1999) (observing that the purpose of the ICPC is to facilitate cooperation between participating states in the placement and monitoring of dependent children, that, although Article III references placement in foster care or as a preliminary to a possible adoption, Article VIII does not preclude its application to placements with non-resident parents, and that Article X provides the ICPC shall be liberally construed, and holding that the ICPC covers the out-of-state placement of a child with a natural parent).

[25] Having established that the ICPC by its terms does not preclude its application to out-of-state placement with natural parents, the question becomes when the ICPC is applicable. On one hand, application of the ICPC may not make sense where there is no evidence that the out-of-state parent may be unfit to care for the child, or a public child welfare agency has not requested information from the ICPC office in the state of the out-of-state parent. On the other hand, application of the ICPC does make sense where evidence before the court suggests the out-of-state parent may be unfit to care for the child, the court has sought evidence regarding the parent's fitness to care for the child, and a public

---

(a) The sending or bringing of a child into a receiving state *by a parent, stepparent, grandparent, adult brother or sister, adult uncle or aunt, or a guardian* and leaving the child with any such relative or nonagency guardian in the receiving state. . . .

Ind. Code § 31-28-4-1 (emphasis added). Notably missing from the statute is any reference to a sending agency.

child welfare agency has submitted a request to the ICPC office in the other state related to the placement. Indeed, the Association of Administrators of the Interstate Compact on the Placement of Children (the "AAICPC") has recommended such an approach in determining when the ICPC is applicable. AAICPC Regulation No. 3 provides in part:

> A placement with a parent from whom the child was not removed: When the court places the child with a parent from whom the child was not removed, and *the court has no evidence that the parent is unfit*, *does not seek any evidence from the receiving state that the parent is either fit or unfit*, and the court relinquishes jurisdiction over the child immediately upon placement with the parent. Receiving state shall have no responsibility for supervision or monitoring for the court having made the placement.

AAICPC Regulation No. 3 (found at http://www.aphsa.org/content/AAICPC /en/ICPCRegulations.html) (last visited Aug. 20, 2015) (Emphasis added). Additionally, the AAICPC states the following:

> Question:
>
> [] When does the ICPC govern the placement of a child with the child's parent or parents and when does it not govern this type of placement?
>
> Answer:
>
> The ICPC does not apply when a non-delinquent child who is under the jurisdiction of a court is placed out-of-state with her or his parent when the following conditions exist:

> The court does not have any evidence that the parent is
> unfit to care for the child
>
> The court does not seek any evidence with regard to the
> parent's fitness to care for the child
>
> At the time of placement a request to place the child with
> the parent has not been submitted to the ICPC office in the
> other state
>
> The ICPC office in the state where the parent lives has not
> previously denied a request to place the child with the
> parent
>
> The court terminates its jurisdiction over the child at the
> time of the placement
>
> The ICPC also does not apply when a child who is not a ward of
> the court or in the custody of a public child welfare agency goes
> to live with a parent in another state.
>
> The ICPC *does apply* when a court *or public child welfare agency
> seeks to place a child with a parent located out-of-state if* the court or
> *agency has evidence that the parent may not be fit to care for the child or
> if the* court or *agency seeks an evaluation of the parent's fitness*.  The
> ICPC applies to any placement with a parent if and when it is
> known that the child will remain a ward of the court or will
> remain in the custody of a public child welfare agency after going
> to live with the parent.

AAICPC FAQ (found at http://www.aphsa.org/content/AAICPC/en/

resources/ICPCFAQ.html) (last visited Aug. 20, 2015) (Emphases added).

[26]     The facts here are that DCS began the process set forth by the ICPC for Father and at the time of the factfinding hearing, that process had not been completed, including a home study and background checks on Father. Additionally, Father had little contact with Child, did not provide regular child support, lived with his girlfriend in an apartment but was not on the lease, did not have a plan for daycare, had worked for his current employer for approximately six months, and was essentially a stranger to Child. The juvenile court's findings of these facts support its conclusion that "[a]bsent the results of the ICPC or background checks and a home study, [Child's] safety with Father cannot be determined." Child was placed with her godmother in Indiana, with whom she was bonded. Under the guidelines set forth by the AAICPC, these facts support application of the ICPC. *See Arizona Dep't of Econ. Sec. v. Leonardo*, 22 P.3d 513, 518-520 (Ariz. Ct. App. 2001) (noting that the majority of jurisdictions that have found the ICPC applicable to out-of-state placement of a child with a non-custodial parent and concluding that, based on Regulation No. 3, when the sending agency is a child protective services agency acting through the state, and the child is placed with a parent or other family member who does not have full custodial rights to or guardianship of the child, the ICPC applies to that out-of-state placement. The case notes further that "this is not to say that the parent may be presumed to be unfit; rather, he or she must be investigated to ensure that the child would be safe if placed with that parent," and that, without the ICPC, a child agency "would lack the legal authority to arrange for services in another state and it would be patently impractical . . . to require an [agency] caseworker to travel to another state to investigate the propriety of a placement"

and "[t]he ICPC best safeguards a child's welfare by requiring the receiving state to investigate and monitor the placement"); *see also Benway*, 745 So.2d at 439 (noting that, "[o]nce a court has legal custody of a child, it would be negligent to relinquish that child to an out-of-state parent without some indication that the parent is able to care for the child appropriately" and "[t]he ICPC provides an effective mechanism for gleaning that evidence and for maintaining a watchful eye over the placement").

[27]   For the reasons above, I conclude that the ICPC applies to placement with Father under these circumstances and thus that it was proper for the juvenile court to consider and in part rely upon the fact that the ICPC process had not yet been completed in making its determination.

[28]   The facts noted herein, together with the evidence regarding Child's age and bond with her godmother and grandmother and lack of bond with Father, support the juvenile court's conclusion. To suddenly send Child, whose Mother had been murdered by her sibling's father two months earlier, to Minnesota with Father who has not participated in her life would be traumatic and could only cause Child greater harm. I agree with the juvenile court that any transition to Father needs to be gradual to ensure that Father has established a bond with Child and Child is in a safe environment.

[29]   For the foregoing reasons, I would affirm the decision of the juvenile court.