## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 21 2020, 10:57 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Lisa Diane Manning
Danville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of J.G., A Child in Need of Services,

J.B., Father,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

December 21, 2020

Court of Appeals Case No. 20A-JC-1319

Appeal from the Jefferson Circuit Court

The Honorable Donald J. Mote, Judge

Trial Court Cause No. 39C01-1611-JC-123

**Kirsch, Judge.**

[1] J.B. (Father) appeals from the juvenile court's order adjudicating J.G. ("Child") to be a child in need of services ("CHINS"). Father raises two issues for our review, which we restate as:

> I. Whether the juvenile court abused its discretion in denying Father's motion to dismiss because he asserts that his due process rights were violated when the fact-finding hearing was not held until several years after the petition was filed; and

> II. Whether the juvenile court's conclusion that Child should remain a CHINS as originally adjudicated because Father's actions and inactions had seriously endangered Child, Child's needs were unmet, and Child's needs were unlikely to be met without State coercion was clearly erroneous.

[2] We affirm.

## Facts and Procedural History

[3] Father and Mother met in Indiana at some point between 2013 and 2014. *Tr. Vol. III* at 74. At that time, they lived together for a few months, and Mother was "in and out" of the home. *Id*. at 75. Father moved to Massachusetts in 2014, and Mother remained in Indiana. *Id*. Sometime in 2014, Father gave Mother a plane ticket, and she flew to Massachusetts to visit Father, at which time they conceived Child. *Id*. at 75-76. Mother returned to Indiana, and the relationship between Mother and Father ended. *Id*. at 77. Father later learned Mother was pregnant with Child, and he believed Child was his. *Id*. at 76, 78. However, Father chose to remain in Massachusetts because he saw "no

significant reason to leave." *Id*. at 78. He was not involved with Mother's pregnancy with Child and was aware that Mother was "very unstable" due to her drug use, but he took no steps to address her drug use. *Id*. at 76-78.

[4] Child was born on November 16, 2014. *Id*. at 63. Although Father was aware of Child's birth, he was not present for it, did not sign a paternity affidavit, and did not file to establish legal paternity. *Id*. at 79, 81. On the day Child was born, Father posted on social media that "his son" was born, and included Child's height and weight, and some pictures of Child. *Id*. at 133-34. Father claimed he sent money orders to Mother but that he later stopped because he thought he was "being taken advantage of." *Id*. at 82.

[5] On November 10, 2016, two years after Child's birth, the Indiana Department of Child Services ("DCS") removed Child from Mother's care and, on November 15, 2016, filed a CHINS petition. *Appellant's App. Vol. 2* at 34, 45-47. In the CHINS petition, DCS alleged Child was a CHINS because of Mother's substance use and because Father, who was only alleged to be Child's father at that time, lived out of state and neither supported nor visited Child. *Id*. at 45-46. On November 15, 2016, the juvenile court held an initial hearing, where DCS again alleged that Father was uninvolved and had never visited or supported Child. *Tr. Vol. II* at 5, 9. At the conclusion of the hearing, the juvenile court found that due to the emergency nature of the situation, no reasonable efforts could be made to prevent removal and that it was in the best interest of Child to be removed from the home environment and that remaining in the home would be contrary to the health and welfare of Child. *Id*. at 11.

[6] DCS did not serve Father with a copy of the CHINS petition or notice of the hearing dates because his whereabouts were unknown, and there is no indication in the record that Father was served by publication. *Appellant's App. Vol. 2* at 45, 48, 49, 108, 174. When the CHINS case began, Father's last known address was in North Vernon, Indiana, but he no longer lived there. *Id*. at 134-35, 184. DCS later learned from Mother that Father had moved to Maine. *Id*. at 54. DCS made a "PPS Investigation referral" in order to try to locate Father. *Id*. at 35.

[7] On November 21, 2016, Father spoke with family case manager ("FCM") Sawyer Beach ("FCM Beach"), and Father stated that he was interested in Child being placed with him; FCM Beach informed Father about the need for Father to establish paternity. *Tr. Vol. II* at 15; *Appellant's App. Vol. 2* at 76, 216. On November 29, 2016, FCM Ashley Shelton ("FCM Shelton") called Father back and again advised him of Child's detention and foster care placement and of the pending CHINS petition and discussed the importance of establishing paternity. *Tr. Vol. III* at 191-92.

[8] On January 10, 2017, the juvenile court held the CHINS fact-finding hearing, at which Mother, but not Father, was present. *Tr. Vol. II* at 13-18. The juvenile court adjudicated Child a CHINS finding:

> 1. [Mother] is the biological mother of [Child].
>
> 2. [Father] is the alleged biological father of [Child].

3. Alleged father lives in Maine, has not established paternity, and neither supports nor visits the child.

4. Mother admits that she has substance abuse issues, which prevent her from providing the necessities for Child, which endangers Child's mental and physical welfare.

*Appellant's App. Vol. 2* at 54. At the fact-finding hearing, the family case manager ("FCM") reported that Father had not been in touch with DCS since November 2016. *Tr. Vol. II* at 16.

On January 11, 2017, FCM Shelton again spoke to Father on the telephone, and they discussed his taking a paternity test. *Tr. Vol. III* at 192-93. Father stated that there was a fifty-dollar charge for a paternity test and wanted to know if DCS would pay for it. *Id*. at 192-94; *Appellant's App. Vol. 2* at 216. Because DCS was not paying for paternity tests at that time, FCM Shelton told Father that she would have to ask her supervisor to see if an exception could be made. *Tr. Vol III* at 194. When FCM Shelton attempted to reach Father again on January 18, 2017, his phone number was no longer in service. *Id*.; *Appellant's App. Vol. II* at 216-17.

On February 10, 2017, the juvenile court held the dispositional hearing, which Father did not attend. *Id*. at 19-24. At the hearing, DCS stated that Father was a presumed father because he had not established paternity. *Id*. at 21. DCS told the juvenile court that Father had been contacted but that he indicated that he "has no interest" in participating in services. *Id*. The juvenile court ordered

Mother into services but also included Father as being required to participate in services. *Appellant's App. Vol. 2 at 92-95.*

[11] In April and May of 2017, FCM Shelton sent letters to Father to establish contact with him and received no response from him. *Id*. at 217; *Tr. Vol. III* at 194. In a letter sent on May 10, 2017, FCM Shelton told Father of an upcoming change in the FCM, but the letter was returned as undeliverable. *Appellant's App. Vol. 2 at 217; Tr. Vol. III* at 194-95. From May 2017 through December 2017, the new FCM, Lisa Kiser ("FCM Kiser"), continued to send letters to Father, which were returned as undeliverable. *Tr. Vol. III* at 229. Because of this, on March 9, 2018, FCM Kiser submitted a new investigative referral to find Father but was never able to make contact with Father. *Id*.

[12] Another FCM took the case over in December 2017, FCM Lydia Stepp ("FCM Stepp"), and performed another investigative referral. *Id*. On March 13, 2018, FCM Stepp sent "letters to addresses listed for Father and called multiple family members to locate Father." *Appellant's App. Vol. 2* at 217. On March 14, 2018, over a year after DCS lost contact with Father, he responded to FCM Stepp and advised that he had not yet had DNA testing to establish paternity but told her he would like to do so. *Id*. A DNA screen was scheduled for May 3, 2018. *Id*. at 217, 222.

[13] On May 3, 2018, after a review hearing, the juvenile court found that between January 11, 2017 and March 2018 Father failed to maintain contact with DCS and did not attempt to be part of the case. *Id*. at 222. On June 26, 2018, Father

appeared telephonically for a termination hearing that had been filed against him and Mother, but that was later dismissed and did not proceed further, and the juvenile court appointed Father legal counsel. *Tr. Vol. III* at 89-90. Since that time, Father appeared regularly by telephone or in person at hearings in the CHINS case. *Id*. at 90-91.

[14] Father missed the scheduled DNA screen on May 3, 2018, but he later completed it on June 4, 2018. *Appellant's App. Vol. 2* at 245. The DNA screen confirmed he was Child's father, and paternity was established in June 2018. *Id*. After contact with Father was re-established, DCS took steps for Father to have parenting time with Child. *Tr. Vol. III* at 236-37. In August 2018, Father began having supervised telephone calls with Child. *Id*.; *Appellant's App. Vol. 3* at 13. While DCS had difficulty reaching Father by telephone after the first visit, weekly phone visits resumed with Father but were sporadic. *Tr. Vol. II* at 116.

[15] On August 20, 2018, Father appeared by counsel in the CHINS case and moved for discovery, requesting the names of witnesses DCS intended to call "in the above cause including those witnesses [DCS] intends to call at the hearing of the above cause, and including all known or anticipated rebuttal witnesses." *Appellant's App. Vol 2* at 248-49. The motion also moved for the discovery order to, "continue to and include the fact-finding hearing in this cause and continue until the completion of the case." *Id*. at 249. The juvenile court granted the motion. *Appellant's App. Vol. 3* at 2.

[16] A review hearing was held on November 1, 2018, at which the DCS progress report was entered into evidence. *Id*. at 17. The report stated, "[Father] has been given the opportunity to complete supervised telephone calls with Child . . . [and] had the opportunity to complete face-to-face parenting time with Child." *Id*. at 13. It further stated, "[t]he visit supervisor has not had contact with Father since the face-to-face visit on 09/23/2018. The visit supervisor has continued to attempt contact each week to facilitate the phone calls." *Id*. The report also advised that "FCM has not been able to contact [Father] by phone since 09/24/2018, [and] FCM has continued to attempt contact with [Father] with no success. FCM sent a letter to Father on 10/16/2018 to establish contact." *Id*.

[17] On February 14, 2019, a permanency hearing was held, and the juvenile court found that Father had not complied with Child's case plan. *Id*. at 44-45. Father had missed several of his weekly supervised telephone visits with Child. *Id*. at 45. DCS had been trying to arrange a second face-to-face visit with Father and Child since September 24, 2018. *Id*. FCM Stepp attempted to contact Father on October 11 and October 16, 2018, by phone and letter, and heard back from him on October 19, 2018. *Id*. FCM Stepp also attempted to contact Father on November 16, November 19, and November 26, 2018. *Id*. DCS was trying to arrange to fly Father to Indiana to have another face-to-face visit, but Father needed a "valid ID in order to board the plane," which he did not have. *Id*. The juvenile court found that "[r]eunification of the child is being unnecessarily delayed due to Father's failure to comply with DCS's request." *Id*. At the

May 16, 2019 review hearing, questions remained as to whether Father had valid identification, and he had still not had another face-to-face visit with Child since September 2018. *Id*. at 69. The report stated that Father "would really like to travel to Indiana to see [Child] but he still is waiting for information about outstanding warrants here in Indiana." *Id*. Father was still having supervised video calls with Child, and thus had partially complied with Child's case plan. *Id*. at 70.

[18] On June 20, 2019, Father filed a motion for a trial home visit and for Child's placement with him. *Id*. at 77-79. He stated that he "currently has seven (7) other children living in his care in Maine." *Id*. at 78. Father acknowledged in the motion that he "has now been a part of the CHINS case since August 2018" but stated that he had not yet had a CHINS fact-finding hearing. *Id*. The juvenile court set Father's motion for hearing on July 18, 2019, but it was continued to August 15, 2019 on Father's motion. *Id*. at 80-82.

[19] After the August 15, 2019 hearing, the juvenile court found, among other findings, that Father "hasn't taken up the offer to either let DCS bring [Child] to him or DCS pay for him to visit [Child] here. It has been one year since [Child] and [F]ather had met." *Id*. at 97. The juvenile court further found that Father "does partially participate with supervised video phone calls twice per week. But [the] visit supervisor maintains that it is very hard to get ahold [sic] of him and really some weeks he is unable to reach [Father.]" *Id*. A permanency plan was adopted for Child to be reunified with Father or Mother, and a fact-finding hearing was set for August 23, 2019. *Id*. at 97-98. DCS filed

a motion to continue the fact-finding hearing and stated that the parties were in agreement as to the continuance, and the juvenile court granted the motion, resetting the hearing to September 27, 2019. *Id.* at 99, 101. On September 17, 2019, DCS filed another motion to continue the fact-finding hearing, and the juvenile court reset the hearing for December 13, 2019. *Id*. at 106.

[20] On August 26, 2019, the juvenile court ordered DCS to make a referral for Child to have a diagnostic evaluation with Stacey Cornett ("Cornett") at Community Mental Health Center, to help the court make "its determination of Father's motion for a trial home visit, which is currently set for hearing September 27, 2019." *Id*. at 102. On October 7, 2019, Cornett completed the clinical assessment of Child. *Tr. Vol. III* at 205. Completion of the assessment was delayed because Cornett had to reach out to Father several times before he replied; he contacted her on October 7, the date she completed the assessment. *Id*. at 205, 211-12. In her assessment, Cornett noted that it was conducted in order to "determine if there were any clinical conditions relevant to [Child]'s functioning, to assess the relationship status between himself and his foster mother, in particular, and to then assess the relationship status between he and [Father]." *Id*. at 207. Cornett concluded that Child had a strong attachment with his foster family. *Id*. at 208. In her initial assessment, Cornett was not able to observe interaction between Father and Child and spoke with Father via telephone, noting that he "showed a desire to be connected to . . . Child and good intentions towards him." *Id*.

[21]     On December 13, 2019, Father's attorney requested a continuance of the fact-finding hearing, in part to review the assessment. *Tr. Vol. III* at 45, 46. DCS agreed to the continuance, and the juvenile court set the CHINS fact-finding for February 3, 2020. *Id*. at 48. Father's attorney agreed to the hearing date. *Id*. at 49. On February 1, 2020, Father filed a motion to dismiss, arguing that the CHINS fact-finding hearing was not timely under Indiana Code section 31-34-11-1 and that he was never properly served with notice of the proceedings. *Appellant's App. Vol. 4* at 55-56.

[22]     On February 3, 2020, the juvenile court held the combined CHINS fact-finding hearing and hearing on Father's motion for Child's placement and motion to dismiss. *Appellant's App. Vol. 2* at 27. At the hearing, Father testified that he lived in Maine with his girlfriend and their combined six children. *Tr. Vol. III* at 63-64. He stated he had lived in the same house for about two-and-a-half years. *Id*. at 63. Father stated that he worked approximately fifty hours a week but had previously collected workers' compensation when he could not work due to an injury. *Id*. at 67-68. Evidence was also presented of Father's criminal history, which included a 2005 conviction for robbery as a Class C Felony, in which he twice violated the terms of his probation. *Id*. at 70-72. On August 6, 2010, a petition for a protection order was filed against and granted against Father, due to domestic or family violence and stalking. *Ex. Vol.* 26-31, 35-38. Father also had numerous traffic charges and convictions for driving while suspended and other infractions. *Id*. at 8-25. At the time of the CHINS fact-finding hearing, Father had an active warrant for failing to appear for trial in

another case. *Tr. Vol. III* at 102. Father testified he knew about the warrant, but did not worry about being arrested, and did not consider the warrant a barrier to his relationship with Child. *Id*. at 102-03.

[23] Father testified that, although he knew about Mother's pregnancy and that there was a possibility that he was the father, he did not take steps to establish paternity until he was contacted by DCS in November 2016 when Child was two years old. *Id*. at 78, 81. Father also testified that he never believed that the CHINS proceedings as they pertained to him were necessary and that there was no need for services for him. *Id*. at 93. He further stated that, although he held those beliefs, he never objected to the prior CHINS adjudication, nor did he ever previously request a fact-finding hearing be held. *Id*. at 93-94. At time of the CHINS fact-finding hearing, Father had only three face-to-face visits with Child since his birth in 2014. *Id*. at 98. The first took place in September 2018 when Father drove to Indiana. *Id*. The second occurred when DCS paid for Father's airfare and hotel accommodations in October 2019. *Id*. at 98-99. This visit was delayed for four months because Father was unable or unwilling to get a valid identification to board the plane. *Id*. at 100-01. The third occurred in November 2019. *Id*. at 98-99. The record showed that on November 11, 2019, Father appeared in person at a review hearing, and the juvenile court instructed Father to submit to a drug screen immediately following the hearing. *Id*. at 39-40, 104. However, Father left the courthouse and never submitted to the ordered drug screen. *Id*. at 238-40.

[24]    FCM Stepp testified that, when she first had contact with Father in March 2018, fourteen months had passed since DCS had last had contact with Father and that delay had a profound effect on the CHINS case and where it stood at the time of the fact-finding hearing because often CHINS case are closed in that amount of time. *Id*. at 230-32. She also testified that it took three months from the date she was able to establish contact with Father to have the DNA test completed, and the delay was in part due to Father's lack of communication with DCS. *Id*. at 233-34. FCM Stepp stated that communication issues continued after paternity was proven due to Father's phone running out of minutes or the lack of service at his home. *Id*. at 235-36. She further stated that, in order for Father to be able to have placement of Child with him, Father would need to understand the long-term effects that Child would have from being in foster care and how to deal with Child's separation and trauma of detention. *Id*. at 241-42.

[25]    Cornett testified about what Father would have to do in terms of services and the likelihood that Child would have difficulties in facilitating a bond between Father and Child. *Id*. at 214-15. Cornett also testified that it was her belief that a parent's absence from a child's life in the first years of the child's life would play a role in the lack of a bond between them because that is how the attachment relationship develops. *Id*. at 215. She stated further that when a child has lived with someone for an extended period of time and has a secure attachment with them, as Child does, the child will experience trauma and grief when separation occurs and in Child's case, there are other considerations

including, foster sibling relationships, extended family, and community ties. *Id.* at 217. Cornett opined that Child was "behind the eight ball in the fact that he would be grieving and has [a] well-established understanding of his relationship with his foster parent" and that "because of his cognitive ability, moving into preschool and school age years, he understands things at a much more complicated level . . . what families are, what loss is, where people are across time and space, . . .so it's more complicated for an older child to manage all of that." *Id.* at 224.

[26] In addition, Father was underestimating Child's weaknesses of entering into a caregiver relationship with Father, and Cornett agreed that Father did not realize that it would "be very challenging and potentially detrimental to Child." *Id.* Cornett testified that Child would need a "plethora" of services to address detaching him from the foster home and attaching him to Father. *Id.* at 220, 221. Due to the length of time from Child's removal and placement in foster care and moving towards reunification, it made it "absolutely" a more complicated issue to address Child's needs. *Id.* at 223-24. Based on this, she recommended a process of reunification that would slowly orientate Child to placement with Father and that it be done in a controlled manner with services available. *Id.* at 227.

[27] Child's court appointed special advocate Harriet Hoffman ("CASA Hoffman") agreed and testified that Father's consistent pattern throughout the case was to be difficult to contact and to keep involved in the case. *Tr. Vol. IV* at 27. She stated that Father's lack of engagement with her was frustrating because it was

her job to gather information in the case, and she was forced to seek out that information from other sources. *Id*. at 20. CASA Hoffman also testified that she believed that Child would suffer trauma from being separated from foster placement and also from Mother if Child were to be placed with Father in Maine. *Id*. at 23.

[28] On April 8, 2020, the juvenile court issued an order determining that Child would remain a CHINS as originally adjudicated and denying both Father's motion to dismiss and for Child's placement. *Appellant's App. Vol. 4* at 132-50. The juvenile court found that, since Child's removal in 2016, he has been placed in a foster home, and has developed a strong attachment with his foster family. *Id*. at 139. The trial court further found that because of this, if that relationship were to suddenly terminate, Child would experience "significant trauma and grief for the loss of his foster parents and of his mother who continues her relationship with Child." *Id*. at 140. The trial court also found that Child needed ongoing services and meetings with Father to reduce the trauma Child will suffer when moving from the care of the foster family to Father. *Id*.

[29] The juvenile court found that the

> significance of Father's criminal history to the Court's ruling here
> is that he is not unfamiliar with court proceedings in Indiana and
> the importance of communication. A phone call from a
> caseworker with [DCS] that you may be the father of a child who
> is in foster care because the mother is battling drug addiction is
> not something to put on the back burner. A "wait and see"

approach can have significant, and life-changing consequences. It certainly has in this case.

*Id*. at 139.  Based on Cornett's testimony and report, the juvenile court found that, "The only way Child can safely be transitioned from foster placement to Father's care is in a controlled scenario with significant therapeutic services in place to address Child's grief of detachment and stress of a new parent." *Id*. at 141.

On June 11, 2020, the juvenile court held the dispositional hearing. *Tr. Vol. IV* at 44-67. On July 6, 2020, the juvenile court issued its written decree, which required among other things, that Father establish paternity, provide Child a stable and safe environment, and attend "individual counseling services to prepare for Child to be placed with him and to gain an understanding of childhood trauma." *Appellant's App. Vol. 4* at 195-98.  Father now appeals.

## Discussion and Decision

## I. Due Process

Due process requires "'the opportunity to be heard at a meaningful time and in a meaningful manner.'" *In re K.D.*, 962 N.E.2d 1249, 1257 (Ind. 2012) (quoting *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976)).  Indiana courts have previously stated that the process due in a termination of parental rights action turns on balancing three *Mathews* factors:  (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged

procedure. *Id*. (citing *In re C.G.*, 954 N.E.2d 910, 917 (2011)). Our Supreme Court has held that these same factors apply to a due process analysis of a CHINS adjudication. *Id*. Ultimately, the resulting balance of those factors must provide "the opportunity to be heard at a meaningful time and in a meaningful manner." *In re L.C.*, 23 N.E.3d 37, 40 (Ind. Ct. App. 2015), *trans. denied*.

[32] Father argues that he was denied his right to due process because the juvenile court failed to conduct a fact-finding hearing until 1,174 days after the filing of a CHINS petition and 692 days after Father voluntarily engaged in services. He contends that he was never served with a copy of the CHINS petition, filed on November 15, 2016, nor given an opportunity to appear for the initial hearing held the same day. Father further asserts that even if his absence from the case for the first year justified the court proceeding to a fact-finding hearing as to allegations against Mother in his absence, the juvenile court erred when it did not conduct a timely fact-finding hearing after Father reengaged in the case. When DCS was able to locate him in March 2018, Father maintains that he immediately began to engage in services to reunify with Child, but that he was denied an opportunity for a fact-finding hearing for another 692 days, which was a violation of his right to due process.

[33] Indiana Code section 31-32-2-3 applies to CHINS proceedings and provides, in pertinent part, that during:

> (1) Proceedings to determine whether a child is a child in need of services [or]

(2) Proceedings to determine whether the parent, guardian, or custodian of a child should participate in a program of care, treatment, or rehabilitation for the child

. . . .

(b) A parent, guardian, or custodian is entitled:

(1) to cross-examine witnesses;

(2) to obtain witnesses or tangible evidence by compulsory process; and

(3) to introduce evidence on behalf of the parent, guardian, or custodian.

[34] Father initially contends that his right to due process was violated because he was not served with a copy of the CHINS petition and because he was not given an opportunity to appear for the initial hearing. However, the evidence showed that, at the time of the CHINS petition, Father was only alleged to be the father of Child as he had yet to take a DNA test, he lived out of state, and he had neither supported nor visited Child. *Appellant's App. Vol. 2* at 45-46. DCS did not serve Father with a copy of the CHINS petition or notice of the hearing dates because his whereabouts were unknown, and he no longer lived at his last known address. *Id*. at 45, 48, 49, 108, 134-35, 174, 184. On the same date that the CHINS petition was filed, the juvenile court held an initial hearing, where DCS again alleged that Father was uninvolved in Child's life and had never visited or supported Child. *Tr. Vol. II* at 5, 9. DCS was initially

able to make contact with Father on November 21, 2016 after locating him in Maine and advised him of Child's detention and foster care placement, of the pending CHINS petition, and about the need for him to establish paternity; on November 29, 2016, he was again advised of the importance of establishing paternity. *Tr. Vol. II* at 15, 191-92; *Appellant's App. Vol. 2* at 76, 216. Thereafter, Father failed to maintain contact with DCS and to establish paternity, and when DCS attempted to contact him, his phone number was no longer in service and letters were returned as undeliverable. *Tr. Vol III* at 194-95, 229; *Appellant's App. Vol. II* at 216-17. We conclude that there was no due process violation in not serving Father with the CHINS petition and in not allowing him an opportunity to appear for the initial hearing because, at that time, he was only alleged to be the father of Child and his whereabouts were unknown.

[35] Father next argues that it was a violation of his due process rights to not conduct his fact-finding hearing until February 3, 2020. Father relies on *In re S.A.,* 15 N.E.3d 602 (Ind. Ct. App. 2014), *clarified on reh'g,* 27 N.E.3d 287 (Ind. Ct. App. 2015), *trans. denied*, in his contention that his right to due process was violated because of the delay in conducting his fact-finding hearing. In *S.A.*, the trial court had already determined the Child's CHINS status based solely on Mother's admission of the allegations -- notwithstanding the fact that Father was involved in the case and had denied the allegations contained in the CHINS petition -- and later held a fact-finding hearing as to Father. *Id.* at 606-07. This court held that by adjudicating the Child as a CHINS prior to Father's fact-finding hearing, the trial court deprived Father of a meaningful opportunity

to be heard. *Id*. at 609. However, on rehearing this court clarified that the opinion stands for the proposition that "[w]hen the [CHINS] adjudication *can* involve both parents at the same time, it *should* involve both parents at the same time so there is one adjudication as to all facts pertaining to the entire matter." 27 N.E.3d at 292 (emphasis in original). If multiple hearings are unavoidable, then the trial court should, if at all possible, refrain from adjudicating the child a CHINS until evidence has been heard from both parents. *Id*. at 292-93. And if an adjudication is unavoidable before evidence has been heard from the second parent, then the trial court must give meaningful consideration to the evidence provided by the second parent in determining whether the child remains a CHINS. *Id*. at 293.

[36] However, Father's reliance on *S.A.* is misplaced. Here, the juvenile court followed the procedure set out in the *S.A.* opinion on rehearing. Multiple hearings were unavoidable in the present case because of the emergency nature of the situation of Mother's drug use and lack of other caregivers for Child and because Father had not yet established paternity and his whereabouts were unknown. Further, the initial CHINS adjudication was also unavoidable because Mother wished to admit the allegations, and at that time, paternity had still not been proven, and DCS was unable to make contact with Father. According to *S.A.*, Father was later given the opportunity for a fact-finding hearing, and the juvenile court gave meaningful consideration to the evidence provided by Father in its determination as to whether Child remained a CHINS.

[37]     Moreover, after DCS was able to re-establish contact with Father in March 2018, he was appointed counsel, who zealously represented his interest, and he became involved in the CHINS case. Indeed, on August 20, 2018, his counsel moved for discovery in an anticipated CHINS fact-finding hearing, but it was not until about a year later, on June 20, 2019, that Father filed a motion stating, among other things, that he had not yet had a CHINS fact-finding hearing. *Appellant's App. Vol. 2* at 244-50; *Appellant's App. Vol. 3* at 78. Soon after, the juvenile court set the fact-finding hearing for August 23, 2019. *Appellant's App. Vol. 3* at 98. However, after several continuances agreed on or otherwise not objected to by the parties, including Father, the fact-finding hearing was held on February 3, 2020. *Id.* at 99, 101, 106, 107, 137; *Tr. Vol. III* at 45-49.

[38]     By seeking continuances or otherwise not objecting to any of the continuances, Father invited any alleged error in any further delays in the fact-finding, and relief is not available to Father. The invited-error doctrine is based on the doctrine of estoppel and forbids a party from taking advantage of an error that she commits, invites, or which is the natural consequence of her own neglect or misconduct. *In re J.C.*, 142 N.E.3d 427, 432 (Ind. 2020) (citing *Durden v. State*, 99 N.E.3d 645, 651 (Ind. 2018)). Where a party invites the error, he cannot take advantage of that error. *Id.* (citing *Witte v. Mundy ex rel. Mundy*, 820 N.E.2d 128, 134 (Ind. 2005)). In short, invited error is not reversible error. *Id.* (citing *Booher v. State*, 773 N.E.2d 814, 822 (Ind. 2002); *C.T. v. Marion Cnty. Dep't of Child Servs.*, 896 N.E.2d 571, 588 (Ind. Ct. App. 2008), *trans. denied*).

[39]     Even under the *Mathews* analysis, Father's due process rights were not violated. The risk of error created by the juvenile court not conducting a fact-finding hearing soon after he became involved in the case was minimal given that he was provided numerous opportunities to continue to move forward toward reunification with Child throughout the case and was not denied any opportunity to be heard at a reasonable time or place. Further, it is undisputed that Father was provided with a fact-finding hearing and the opportunity to present evidence and challenge that Child was a CHINS. The record shows that Father received all rights contemplated under Indiana Code section 31-32-2-3. Due process embodies a requirement of "fundamental fairness." *In re D.P.*, 27 N.E.3d 1162, 1166 (Ind. Ct. App. 2015). We, therefore, conclude that there is nothing in the record to suggest that Father was not provided the process due him and deprived of fundamental fairness before the juvenile court determined that Child should remain a CHINS as previously adjudicated and issued its dispositional order. Father has failed to carry his burden of showing that his due process rights were violated.

## II.   CHINS Adjudication

[40]     CHINS proceedings are civil actions, and therefore, it must be proven by a preponderance of the evidence that a child is a CHINS as defined by statute. *In re L.C.*, 23 N.E.3d 37, 39 (Ind. Ct. App. 2015) (citing *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010)), *trans. denied*. When we review a CHINS determination, we neither reweigh the evidence nor judge the credibility of the witnesses. *Id*. We consider only the evidence that supports the juvenile court's decision and

the reasonable inferences drawn therefrom. *Id*. at 39-40. Where the trial court issues findings of fact and conclusions thereon, we apply a two-tiered standard of review. *In re R.P.*, 949 N.E.2d 395, 400 (Ind. Ct. App. 2011). We consider first whether the evidence supports the findings and then whether the findings support the judgment. *Id*. We will set aside the trial court's findings and conclusions only if they are clearly erroneous and a review of the record leaves us firmly convinced that a mistake has been made. *Id*. "Findings are clearly erroneous only when the record contains no evidence to support them either directly or by inference." *K.B. v. Ind. Dep't of Child Servs.*, 24 N.E.3d 997, 1001-02 (Ind. Ct. App. 2015) (citation omitted). "A judgment is clearly erroneous if it relies on an incorrect legal standard." *Id*. at 1002.

[41] Father argues that the juvenile court erred when it found that Child was a CHINS. He claims that the CHINS adjudication was not based on his actions or inactions but instead upon the harm that removal from foster care would cause Child and on Father's unwillingness to move with Mother to Indiana during her pregnancy. Father contends that these reasons do not support a CHINS adjudication, and DCS failed to present any evidence that Child's needs are unmet and unlikely to be met without the coercive intervention of the court. Father asserts that he completed all services requested by DCS at the time of the fact-finding hearing and had visited with Child several times over nearly two years before the CHINS adjudication. He further maintains that the harm caused by DCS's unwillingness to remove Child from foster care and place Child with Father should not provide the basis for a CHINS

determination. He argues that DCS's continued requirements and delayed due process for Father resulted in Child remaining in foster placement for over three years before he had an opportunity to be heard on the CHINS allegations and the potential trauma caused by removing Child from foster placement was caused by this delay.

[42] DCS had the burden of proving by a preponderance of the evidence that Child was a CHINS. Ind. Code § 31-34-12-3. Indiana Code sections 31-34-1-1 through 11 specify the elements of the CHINS definition that the State must prove:

> (1) the child is under the age of 18;
>
> (2) one or more particular set or sets of circumstances set forth in the statute exists; and
>
> (3) the care, treatment, or rehabilitation needed to address those circumstances is unlikely to be provided or accepted without the coercive intervention of the court.

*In re N.E.*, 919 N.E.2d at 105. Here, the juvenile court adjudicated Child to be a CHINS pursuant to Indiana Code section 31-34-1-1,[1] which provides:

---

[1] Indiana Code section 31-34-1-1 was amended in 2019, to include the following under subdivision (1): "(A) when the parent, guardian, or custodian is financially able to do so; or (B) due to the failure, refusal, or inability of the parent, guardian, or custodian to seek financial or other reasonable means to do so . . . ." This amendment does not have any effect on the outcome of this appeal.

A child is a child in need of services if before the child becomes eighteen (18) years of age:

(1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

[43] Therefore, this statute requires "three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and . . . that those needs are unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014).

[44] Father does not challenge the sufficiency of the evidence to support any of the other findings by the juvenile court. As Father does not challenge any of the remaining findings of facts by the juvenile court, these unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied; McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997) (when father failed to challenge specific findings, court accepted them as true).

"Although the acts or omissions of one or both parents can cause a condition that creates the need for court intervention, the CHINS designation focuses on the condition of the children rather than on an act or omission of the parent(s)." *In re K.P.G.*, 99 N.E.3d 677, 682 (Ind. Ct. App. 2018) (citing *In re N.E.*, 919 N.E.2d at 105), *trans. denied*. Therefore, "despite a 'certain implication of parental fault in many CHINS adjudications, the truth of the matter is that a CHINS adjudication is simply that -- a determination that a child is in need of services.'" *Id.* (quoting *In re N.E.*, 919 N.E.2d at 105).

Here, from the time Child was born in November 2014 and until the time of the CHINS factfinding finding hearing in February 2020, Father only had three face-to-face visitations with Child, with the first happening in September 2018, and the next two occurring in October and November 2019. *Tr. Vol. III* at 98-99. Therefore, Father saw Child face-to-face for the first time just before Child turned four years old and the not again until Child was five years old. While supervised visitations via video for Father with Child occurred, they did not begin until August 2018, and even then, up until around the fall of 2019, Father was inconsistent in his participation. *Appellant's App. Vol. 3* at 13, 44-45, 97. Father's failure to fully participate in these visitations shows a lack of commitment to do what was required to maintain his relationship with Child. *See Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007) (stating that, in the context of termination, the failure to exercise the right to visit one's children demonstrates a lack of commitment to complete the actions necessary to preserve the parent-child relationship), *trans. denied*.

[47] Father chose to absent himself from Child's life, and the juvenile court did not find Father's reasons explaining his lack of involvement credible. *Appellant's App. Vol. 4* at 136. The juvenile court found, considering all of Father's involvement in the court system, that receiving a "phone call from a caseworker with the Department of Child Services that you may be the father of a child who is in foster care because the mother is battling drug addiction is not something to put on the back burner" and that delaying action in such a situation can have significant, and life-changing consequences, as it has in the present case. *Id*. at 139. Therefore, Father's failure to reach out and to stay in communication with DCS was unreasonable and proved a great detriment to Child.

[48] The evidence showed that Child was attached to his foster family and that removing Child from the foster family abruptly would cause trauma to Child and that time and services were needed to facilitate a bond between Father and Child. Cornett testified that it was her belief that a parent's absence from a child's life in the first years of the child's life would play a role in the lack of a bond between them because that is how the attachment relationship develops. *Tr. Vol. III* at 215. She stated further that, because Child had lived with his foster family for an extended period of time and had a secure attachment with them, Child will experience trauma and grief if separated from the foster family. *Id*. at 217. Cornett opined that Child's separation from foster family would be more complicated because of the length of time he had lived with them and his older age. *Id*. at 224. Additionally, Cornett testified that Father was

underestimating Child's weaknesses of entering into a caregiver relationship with him and that he did not realize that it would "be very challenging and potentially detrimental to Child." *Id*. Cornett testified that Child would need a "plethora" of services to address detaching him from the foster home and attaching him to Father. *Id*. at 220, 221. Based on this, she recommended a process of reunification that would slowly orientate Child to placement with Father and that was done in a controlled manner with services available. *Id*. at 227. However, Father told Cornett that services were not necessary, and he indicated that he thought that Child would adjust adequately and disagreed that it would likely be very challenging and potentially detrimental. *Id*. at 224. Father's position posed a threat of harm to Child's well-being.

[49] A CHINS adjudication is a determination that a child is in need of services. *In re K.P.G.*, 99 N.E.3d at 682. Indeed, a child's safety and well-being are the foremost considerations in a CHINS case. *In re N.E.*, 919 N.E.2d at 106 ("[T]he purpose of a CHINS adjudication is to protect children, not punish parents"). The evidence, here, shows that removing Child from his foster placement abruptly and placing him with Father would result in trauma for Child due to the strong attachment he had to the foster family and the length of time Child has been placed with the family. The evidence also showed that Child would require significant services to lessen this trauma and allow for the transition to occur. Further, the evidence demonstrated that Father did not appreciate or understand the need for these services or the trauma that could

occur by abruptly removing Child from the foster family and placing him with Father, with whom he did not have a strong bond.

[50] Father relies on *In re D.B.*, 43 N.E.3d 599 (Ind. Ct. App. 2015), *trans. denied*, as support for his argument that the juvenile court erred in its CHINS adjudication. He contends that *D.B.* supports his position that he was merely an absent parent, which alone does not support the CHINS adjudication. However, we find *D.B.* to be distinguishable from the present case. A panel of this court reversed the trial court in *D.B.* and found insufficient evidence to support the CHINS adjudication*,* holding that while the father was absent from the child's life up until the time the mother was murdered, DCS offered no proof that the father was unfit, only that he was absent. *Id*. at 606. Unlike Father in this case, the father in *D.B.* was involved in the pregnancy, he was there for the child's birth, executed a paternity affidavit, and participated in caring for the child for at least four months until the mother moved to Indianapolis. *Id*. at 601-02. Although the father was absent from the child's life for almost a year, almost immediately after being contacted by DCS, he became involved in the CHINS proceedings. *Id*.

[51] Here, Father knew Mother was pregnant with Child when she returned to Indiana or shortly thereafter and chose to remain in Massachusetts because he saw "no significant reason to leave." *Tr. Vol. III* at 78. Further, despite concerns Mother suffered from a serious drug addiction, Father did nothing to help Mother or Child before or after Child's birth. Father also did not seek paternity immediately, and when DCS suggested he do so, Father balked at

paying the fifty dollars to have the DNA test completed. Father then ceased communication with DCS, leaving DCS with no phone number or address to reach him, for over one full year while Mother continued to abuse methamphetamine and Child remained in foster placement. We, therefore, find *D.B.* is distinguishable from this case and not controlling in the outcome here.

[52] The CHINS statutes do not require that a trial court wait until a tragedy occurs to a child before intervening. *In re C.K.*, 70 N.E.3d 359, 364 (Ind. Ct. App. 2016), *trans. denied*. We, therefore, conclude that sufficient evidence was presented at the fact-finding hearing to establish that Father was unable or refused to supply Child with necessary food, clothing, shelter, medical care, education, or supervision, and Child's physical or mental condition was seriously impaired or seriously endangered as a result and that Child needed care, treatment, or rehabilitation that he was not receiving and was unlikely to be provided without the coercive intervention of the court. *See* Ind. Code § 31-34-1-1. The juvenile court did not err in concluding that Child should remain a CHINS as originally adjudicated.

[53] Affirmed.

Bradford, C.J., and May, J., concur.